**GOVERNMENT SUPPLIERS CONSOLIDATING SERVICES, INC., and Jack Castenova, Inc., Plaintiffs,**

**v.**

**The Honorable Evan BAYH, Governor of the State of Indiana, Defendant.**

**No. IP 90–303–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

Dec. 27, 1990.

---

Ronald J. Waicukauski, White & Raub, Indianapolis, Ind., Bruce L. Thall, Philadelphia, Pa., for plaintiffs.

Harry John Watson III, Michael T. Schaefer, Office of Attorney General, Indianapolis, Ind., for defendant.

MEMORANDUM ENTRY OF THE DECISION AFTER TRIAL ON PLAINTIFFS' COMPLAINT FOR DECLARATORY RELIEF

## Table of Contents

I. Introduction ........................ 742
II. Findings of Fact ................... 743
III. Conclusions of Law................. 756
 A. Standing and Ripeness ......... 756
 B. Commerce Clause .............. 762
 1. Tipping Fee Provision ........ 766
 2. Health Officer Certification ... 772
 3. Hauler Certification.......... 774
 C. Vagueness ..................... 779
IV. Conclusion ........................ 779

TINDER, District Judge.

### I. Introduction

In 1978 the United States Supreme Court applied the dormant commerce clause to dispose of a New Jersey law banning the importation of out-of-state trash. In his

majority opinion Justice Potter Stewart observed as follows:

> Today, cities in Pennsylvania and New York find it expedient or necessary to send their waste into New Jersey for disposal, and New Jersey claims the right to close its borders to such traffic. Tomorrow, cities in New Jersey may find it expedient or necessary to send their waste into Pennsylvania or New York for disposal, and those States might then claim the right to close their borders. The Commerce Clause will protect New Jersey in the future, just as it protects her neighbors now, from efforts by one State to isolate itself in the stream of interstate commerce from a problem shared by all.

*City of Philadelphia v. New Jersey,* 437 U.S. 617, 629, 98 S.Ct. 2531, 2538, 57 L.Ed.2d 475 (1978). The day foretold in *City of Philadelphia* has arrived.

Today cities in New Jersey and other Eastern states find it necessary, or at least expedient, to ship their waste hundreds of miles to the State of Indiana. This case involves an attempt by Indiana to regulate the influx of that out-of-state waste. In a broader sense, however, this case involves the collision of local concerns with a national problem.

The citizens of the State of Indiana are in the unenviable position of residing in a state which is an economically favorable dumping ground for the refuse of the Eastern states. Besides the deposit of undesirable materials from other states into Indiana soil, the status of being a trash "receiving" state means that the space available here for the disposal of Indiana waste is diminishing due to the inflow of non-Indiana trash.

Indiana's problem is not unique. The reported cases reflect that out-of-state trash is the object of nationwide concern, as well as disdain. Congress itself, however, has not yet deigned to touch the subject in a comprehensive manner. Thus, as the states become fed up, or filled up, with out-of-state waste, the harmony of each state's regulations with the dormant commerce clause is likely to be considered on a case by case basis.

This entry first relates the facts established at trial that are relevant to the issues before this court. This case was hotly contested by counsel for both parties, and the facts found here are the result of the court having carefully weighed all of the evidence and the reasonable inferences to be drawn from those facts. Second, this entry sets forth the controlling legal principles and applies those principles to the findings of fact.[1] Finally, this entry is accompanied by a judgment consistent with the determinations made herein.

## II. *Findings of Fact*

Evan Bayh, Governor of the State of Indiana, signed House Enrolled Act 1240 (hereinafter referred to as the Act or H.E.A. 1240) into law on March 20, 1990. The Act was the product of compromise among Republicans and Democrats in the Indiana General Assembly and between the General Assembly and the Governor. The immediate derivation of the Act can be found in several bills originally introduced in the 1990 Regular Session of the Indiana House and Senate[2] as well as in various legislative initiatives advanced by the administration of Governor Bayh.[3] The history of the Act also includes efforts to enact

---

**1.** To the extent that a matter labelled as a fact would be more appropriately called a conclusion of law, or vice versa, the designation of these matters as fact or law should not be controlling. Instead, the facts and the law, and mixed determinations of fact and law should be considered to support the judgment of the court regardless of the labels.

**2.** House Bills 1109, 1390 and 1240 and Senate Bill 66, all introduced in the 1990 Regular Session of the Indiana General Assembly, appear to

be legislative sources of the concepts which resulted in H.E.A. 1240.

**3.** The Governor's initiatives regarding the disposal of solid waste were generally described in his 1990 State of the State address, delivered on January 9, 1990. The address was accompanied by a 1990 legislative program. Additional particulars of the objectives of Governor Bayh's administration regarding solid waste disposal can be found in an executive order he issued on November 9, 1989.

similar legislation in the previous session of the legislature.[4]

The Act was codified in Title 13 of the Indiana Code, the portion of Indiana laws which deals specifically with environmental concerns. This classification is appropriate because the Act imposes certain requirements on the disposal of solid waste[5] within the State of Indiana.

The plaintiffs seek a declaratory judgment that three provisions of H.E.A. 1240 regarding the hauling of waste into the State of Indiana are unconstitutional under the commerce clause of article I, section 8, and the due process clause of the fourteenth amendment of the United States Constitution. The challenged portions of the Act are codified as follows: Ind.Code § 13–7–22–2.7(c)(1) (hauler certification); Ind.Code § 13–7–22–2.7(c)(2) (health officer certification); and Ind.Code § 13–9.5–5 (tipping fee). The plaintiffs further request that this court permanently enjoin the defendant from enforcing these provisions. The Governor[6] vigorously opposes this declaratory action on several grounds which will be discussed below.

Within the State of Indiana, there are a number of sites where solid waste can be disposed of legally, which are called sanitary landfills. These landfills, which fall within the legal definition of "final disposal facilities,"[7] operate by virtue of permits issued by the state and are subject to strict regulation by various state agencies, including principally, the Indiana Department of Environmental Management (IDEM). Ind.Code § 13–9.5–1–14. IDEM is the agency primarily charged with the enforcement of Indiana environmental laws and regulations. This agency is responsible for the issuance of permits for the establishment of both sanitary and hazardous material landfills as well as the regulation of the actual operation of such landfills.

Indiana law requires "cradle-to-grave" tracking of hazardous materials. An entity causing the production of hazardous waste is required to report information about the creation of such waste, including the quantity of the hazardous materials. A transporter of such waste has to prepare a similar report or manifest, as does the disposer of the material. IDEM, through matching

4. In the 1989 Regular Session, the Indiana House passed House Bill 2060 and the Indiana Senate passed Senate Bill 545, but the respective chambers were unable to resolve differences in the bills before that session came to a close. The subjects of those bills were referred to a bicameral Interim Study Committee on Environmental Issues. That committee held several meetings in the months between legislative sessions during which it heard presentations on environmental subjects, including solid waste disposal, and concluded by making various findings and recommendations to the 1990 legislature.

5. Solid waste is what we commonly call trash. It consists of the types of items that are disposed of from households, businesses and restaurants. It is sometimes referred to as "municipal solid waste," presumably because one of the services often provided by municipalities is the collection and disposal of such wastes. The solid nature of the waste is in contrast to the liquid wastes that are disposed of primarily through sewer and septic systems.

6. Throughout this entry, the defense position will be referred to as being asserted by the Governor. This is not intended to imply that Governor Bayh has a personal stake in this matter. Rather, as the chief executive of the State of Indiana, and because he is responsible

for the enforcement of the Act, he is named as the sole defendant. *See Government Suppliers Consolidating Servs. v. Bayh,* IP 90–303–C (S.D. Ind. June 8, 1990) (entry and order granting defendant State of Indiana's motion to dismiss for lack of subject matter jurisdiction). Actions taken and arguments made by state agencies, administration officials and attorneys for the defense are attributed to the Governor the for sake of simplicity in this entry. The Governor was forcefully defended in this proceeding by the Attorney General of Indiana.

7. This suit involves efforts to dispose of waste at sanitary landfills. It does not involve the disposal of waste at hazardous material landfills or any other method of disposal of waste materials such as incineration. When used throughout this entry, the "landfills" referred to are sanitary landfills, unless specified otherwise. The statutory provisions at issue in this lawsuit use the term "final disposal facility." Ind.Code § 13–9.5–1–14 defines a "final disposal facility" as a landfill, an incinerator, or a waste-to-energy facility. The definition specifically states that a final disposal facility does not mean a transfer station. The evidence in this case focused primarily on landfills as opposed to incinerators or waste-to-energy facilities. Thus, this court will most often refer to landfills as shorthand for "final disposal facilities."

of these reports or manifests, is able to track the major source generators of hazardous waste materials within the state.

Disposal at Indiana sanitary landfills is accomplished by hauling solid waste to the landfill site, usually by truck or a similar motor vehicle and dumping the waste into the landfill. Trash is brought to Indiana landfills from collection points both within and outside the state.

The Act requires that the operator of a vehicle containing a load to be dumped at an Indiana landfill present the operator of the landfill with a verified statement about the location "in which the largest part of the solid waste was generated." Ind.Code § 13-7-22-2.7(c)(1). If the "largest part of the solid waste was generated" within Indiana, the vehicle operator must certify the county in Indiana in which the waste was generated. If the "largest part of the solid waste" was generated out-of-state, the vehicle operator must certify the state in which such waste was generated. *Id.* If the "largest part of the solid waste was generated in a state other than Indiana," an operator desiring to dump the trash must also present a statement from a public health or environmental state or local officer from the state in which the trash was generated certifying that the part of the load generated in that state "is not subject to regulation as hazardous waste under the federal Solid Waste Disposal Act (42 U.S.C. 6901 *et seq.*) or as infectious waste under [Ind.Code §] 16-1-9.7." Ind. Code § 13-7-22-2.7(c)(2).

Kathy Prosser, Commissioner of IDEM, indicated that the purpose of the certification requirements was to facilitate the tracking of waste being deposited in Indiana landfills and to enhance the accountability of violators of Indiana waste disposal laws and regulations for enforcement purposes. It is interesting to note that the Act does not require that either certificate must be sent to IDEM, and neither the hauler nor the landfill operator is required to keep the certificates.

The Act also provides that the fee for dumping a load of trash generated in Indiana is $0.50 per ton. The fee for dump-ing trash "generated outside of Indiana," however, equals the fee for dumping that trash at a site closest to the location where the trash was generated, minus the fee actually charged for disposal by the operator of the final disposal facility in Indiana or $0.50 a ton, whichever is greater. Ind. Code § 13-9.5-5-1.

Prior to the enactment of H.E.A. 1240, both the legislature and the Governor were concerned about the quantity and composition of out-of-state trash being dumped at Indiana landfills. The Governor's concern was expressed in a number of public statements made both before and after his election in November of 1988. On April 9, 1990, the Governor revisited a landfill located near Wabash, Indiana that he first visited during the 1988 gubernatorial campaign. A press release issued in connection with the 1990 visit noted that Bayh had visited Wabash during his campaign "to say that Indiana needed to take aggressive action to ensure that Indiana did not become the dumping-ground of trash from the East Coast." The release also alluded that the promulgation of H.E.A. 1240 was a step in that aggressive direction. Therefore, this court has concluded that the Governor's views on the subject of out-of-state trash were developing, if not fully developed, by the time he was elected. Barton Peterson, a campaign volunteer who now serves as an Executive Assistant to the Governor, confirmed that candidate Bayh had, in fact, publicly expressed his desire to see the flow of out-of-state trash into Indiana halted. Peterson, whose duties now include advising the Governor on environmental affairs, testified that the Governor was adamantly opposed to out-of-state waste coming into Indiana.

As mentioned above, the Indiana Governor makes a speech to the legislature at the beginning of each annual session called the "State of the State" address. The purpose of the address is described by the title, and the subject matter of the address traditionally includes a description of major legislative programs that the executive branch intends to promote during the upcoming legislative session. In the portion

of the 1990 address relevant to this case, the Governor announced:

> But what is objectionable, what is offensive, and what must be stopped is the tidal wave of out-of-state trash that threatens to turn Indiana into a dumping ground for the nation.
>
> It's coming by the truckload, it's coming by train, it's using up scarce disposal capacity, and it threatens our ability to manage our own needs. To show you just how bad things have become, I have with me a piece of out-of-state garbage which blew off a truck headed for a Hoosier landfill. On it is printed "State of New York." Well, with all due respect to the State of New York, if it's their property, they should keep it.
>
> . . . .
>
> We must end the financial incentive that literally makes it pay for out-of-staters to dump in Indiana. If it costs $70 for another state to dispose of its waste at home, it should not cost them $11 here;
>
> . . . .
>
> Last year, I requested a bill to combat these problems, but none was passed. This year, I'm asking you again. If not for me, then for the people of our state, pass the environmental protection bill.

The State of the State speech was accompanied by a 1990 legislative program which also referred to out-of-state waste problems. The Bayh Administration program included a proposal to require shippers of solid waste to document their loads in order to provide useful information to regulatory authorities charged with the protection of health, safety and the environment as well as a proposal to eliminate the economic incentive for bringing out-of-state trash into Indiana through higher disposal fees on "foreign" trash. The proposal also referred to the implementation of more stringent measures to ensure that out-of-state waste did not contain hazardous or infectious materials through certification by the top environmental officer in the state of origin. The Governor's legislative initiative had been preceded by an executive order, issued on November 9, 1990, which,

among other things, directed IDEM to prepare legislation establishing differential fees for the disposal of solid waste based on the source of the trash.

The Governor's office was extremely active in the shaping of the H.E.A. 1240 hybrid bill, as evidenced by news releases issued on the subject and the post-enactment statements made about the bill. After the Governor signed H.E.A. 1240, his office issued a press release which referred to the legislation as a measure that "will help stop the importation of out-of-state garbage into Indiana" and promised that this law, as well as others, "will end the financial incentive that has made it a paying business for trash haulers from outside of Indiana to dump garbage here." The Governor conducted bill-signing ceremonies in three locations around the state after the enactment of H.E.A. 1240 and other environmental bills. At one of these stops, the Governor was quoted by a reporter covering the event as saying, "I intend to stop out-of-state dumpers literally in their tracks."

The Governor was not the only one in his administration making firm statements about this subject. Commissioner Prosser addressed the Interim Study Committee on Environmental Affairs in July of 1989 to express the concerns of the Bayh administration about the need for legislation to address problems associated with trash originating outside of the state of Indiana. In the prepared text of Commissioner Prosser's remarks to that body, she observed:

> The recently accelerated influx of out-of-state waste into Indiana, principally from the east coast, threatens the very foundation of our state's solid waste management system, such as it is. Governor Bayh has been talking about this problem and seeking a solution since before his inauguration in January. We cannot allow Indiana to become the dumping ground for the nation's garbage. We must seek to control the out-of-state waste problem before it literally buries us.
>
> The comprehensive solid waste management bill provided three specific

disincentives for the importation of out-of-state waste: (1) It imposed a higher tipping fee surcharge for out-of-state waste than for waste generated in Indiana; (2) if the surcharge in the state of origin is higher than the surcharge in the Bill for out-of-state waste, the hauler would be required to pay the higher surcharge; and (3) the bill would have permitted counties or solid waste management regions to limit or prohibit importation of out-of-state waste, where necessary, to meet the long-range planning goals of the county or district.

Some have questioned the constitutionality of these provisions. We should not accept the elimination of our state's landfill resources simply because those with a vested interest in the unfettered flow of garbage across state lines assert that the flow cannot be stopped. That's a matter for the courts to decide. In the meantime, timidity in the face of this assault from out-of-state waste is unacceptable.

Commissioner Prosser was joined by others in the administration who expressed concern about the influx of out-of-state trash. Executive Assistant Peterson was quoted in one newspaper article as saying that the Governor's office would not be satisfied as long as out-of-state trash was flowing into Indiana in large quantities and that it was the Governor's goal to bring a halt to the importation of out-of-state trash.

In addition to statements made in Indiana, Governor Bayh addressed a committee of Congress about his concerns regarding the importation of trash into Indiana. He urged Congress to pass legislation that would allow the states greater control over the regulation of the flow of trash across their borders.[8] He also made individual visits to members of Congress to urge their support for greater states'

rights over the regulation of interstate commerce in trash.

Members of the Indiana General Assembly also expressed concern about the problem of out-of-state trash. Both major political parties emphasized their efforts to stem the flow of out-of-state trash. The final report of the 1989 Interim Study Committee on Environmental Issues alluded in its findings to the need to find a solution that would deter or eliminate out-of-state waste from coming into Indiana. In addition, several Republican senators and representatives jointly announced legislative goals prior to the 1990 Regular Session which included elimination of the financial incentive to import trash into Indiana. After the enactment of H.E.A. 1240, members on both sides of the aisle sought to take credit for erecting a restraint on the unlimited dumping of out-of-state trash.

The concern of the Governor and the legislators about the quantity and composition of out-of-state trash coming into Indiana landfills, albeit sincere, was based on anecdotal information rather than on any detailed study of the dumping of out-of-state trash or the deposit of hazardous and/or infectious materials in Indiana landfills. Indeed, as of the time of the trial in this case, Commissioner Prosser had no quantifiable information available to her about the amount of hazardous waste legally deposited in non-hazardous waste landfills in Indiana.[9]

Nonetheless, this court does not doubt that Commissioner Prosser is truly concerned about the dumping of hazardous and infectious waste into Indiana's sanitary landfills. Similarly, she is undoubtedly concerned about the volume of trash that is being deposited into Indiana landfills, even though she does not have any statistical information to document or approximate the quantity or type of waste entering the state. She has like concerns about infec-

---

8. The Governor's testimony, given on January 25, 1990, prior to the enactment of H.E.A. 1240, alludes to the Supreme Court decision in *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), and acknowledges the limitations on state restrictions expressed in that opinion.

9. Generators of hazardous waste who generate less than one hundred kilograms per month are not regulated by the federal Solid Waste Disposal Act. *See* 42 U.S.C. § 6921(d).

tious wastes, despite a comparable paucity of data.

With respect to the quantity of waste coming into the state, the most authoritative information was gathered by a citizens' action group, Hoosiers Opposing Pollution of the Environment (HOPE). By positioning teams of volunteers near the roads leading to a landfill in Clay County, Indiana, HOPE was able to document 5,500 trucks headed toward that one landfill. Many of these trucks began their journey outside the State of Indiana. Members of HOPE were concerned about the influx of trash into the state, and vigorously made these concerns known to the Indiana General Assembly, the Governor and Congress. HOPE lobbied for H.E.A. 1240 and sought the imposition of a higher fee on the disposal of out-of-state trash in order to stop or discourage the importation of such trash. A representative of HOPE verified that the enactment of H.E.A. 1240 had a dramatic effect on the importation of trash into the Clay County landfill; the dumping of out-of-state trash at that landfill stopped, at least until this court issued the preliminary injunction in this case.

The state's concern about hazardous materials is genuine. Indiana has 37 Superfund sites located within its borders, two of which are sanitary landfills. In addition, pursuant to Indiana law, the state has designated 1,400 other locations as sites which are in need of remedial cleaning. These additional sites do not qualify for federal Superfund designation pursuant to the scoring system for Superfund sites, see 40 C.F.R. Part 300, but nonetheless pose an environmental hazard to the citizens of Indiana. Some sanitary landfills are on that 1,400 site list.

Funds of the State of Indiana will be used for the clean-up of the 1,400 sites and the state will seek to find the parties responsible for the hazardous condition of the sites in order to pass the clean-up costs on to the responsible parties. The federal Superfund program also attempts to identify polluters and to hold them accountable for their misconduct. However, this court finds no evidentiary basis for concluding that the hazardous waste problems at the Indiana landfills referred to above were caused by the deposit of hazardous waste materials that had originated outside of Indiana.

The plaintiffs broker the hauling of loads of solid waste from sites in the eastern portion of the United States to locations primarily in the Midwest. The trash that the plaintiffs broker originates in the states of New York, New Jersey and Pennsylvania. Landfill space is at a premium in those states, particularly in the more urban areas. Consequently, despite the cost of transporting the trash hundreds of miles to Indiana, it is still far less expensive to dump the waste here where landfill space is more plentiful. For example, a Long Island landfill named Fresh Kills charges $125.00 dollars a ton to dump municipal waste. In most Indiana landfills, the typical charge is approximately $12.00 dollars a ton. The hauling cost per ton is approximately $33.00 to $35.00 dollars per ton.

The business of matching trash collectors with less expensive Midwestern landfill operators, known as "trash-brokering," can be profitable. The revenue obtained by trash-brokering results from putting the disposal deal together rather than performing any part of the disposal transaction. Thus, the plaintiffs do not haul the trash themselves nor do they own the vehicles in which it is hauled. Typically, they arrange verbally to have haulers pick up trash at particular municipal solid waste and recycling stations in New York, New Jersey and Pennsylvania after having arranged for the dumping of this waste in Midwestern landfills. As brokers, the plaintiffs use their contacts to link the waste from an Eastern trash collection source with the independent haulers who then transport the trash to the Midwestern landfills.

It should be noted that many of the truckers who haul the trash to Indiana "backhaul," that is, take commercial goods back East on their return trips after dumping the trash loads. In some instances, the return loads consist of food products for

sale in the Eastern states.[10] The loads brokered through the plaintiffs are accompanied by manifest paperwork that designates the quantity of the load, where it is going, the name of the trucking company and the landfill destination. This form is made out at the recycling or transfer station where the load originates, and a copy is sent back to the plaintiffs by the trucker. The paperwork bears the broker's name. Although trash brokering is a common practice, H.E.A. 1240 does not require disclosure of a broker's identity, despite the state's purported interest in tracking and accountability.

The plaintiffs do not have any ownership interest in the landfills, trucks, trash collection and recycling centers, or trash being dumped in Indiana. The plaintiffs serve strictly as brokers, linking the collectors, haulers and landfill operators in three-way deals. They do not utilize written contracts, but rather put each deal together verbally on a short-term, one-time basis. The plaintiffs have long-term relationships with some trash sources, haulers and landfills, but do not have contractual arrangements that extend over more than one transaction at a time. The nature of this brokering business does not require employment of drivers or other employees in the actual collection, transportation or dumping of trash. It is conducted primarily over the telephone. The plaintiffs have visited some of the trash sources, but do not do so on a regular basis. These visits were made primarily for customer relations and not for the purpose of conducting inspections.

The trash brokering business of Government Suppliers operates much like the Castenova business. About sixty percent of Government Suppliers' trash brokering business resulted in the dumping of waste in Indiana landfills. Jack Castenova testified that fifty percent of his business through 1989 involved the disposal of waste at Indiana landfills. Prior to the enactment of the legislation at issue, Castenova would broker as many as fifteen loads

of out-of-state waste a day into the State of Indiana.

Enforcement of the three provisions of the Act at issue in this suit will tend to diminish the amount of trash that comes into the State of Indiana from outside the state. Similarly, enforcement of the three provisions in question will have an adverse effect on the amount of the plaintiffs' business that could be conducted within Indiana. Jack Castenova indicated that the enforcement of the statutes at issue would be disastrous to his business. Jack Lynch of Government Suppliers indicated that enforcement of these statutes would wreak havoc on that business and would, in his words, "send it down the tubes." The tipping fee provision would completely prevent Castenova and Government Suppliers from conducting their business in the State of Indiana because the cost of dumping the trash, combined with the cost of transporting it to Indiana, would exceed their profits.

As noted above, neither the hauler certification nor the health officer certification are required to be filed with IDEM, but a number of haulers or landfill operators did transmit copies of such documents to IDEM after H.E.A. 1240 went into effect. For the most part, the forms used appeared to comply with the hauler certification requirements but were not in compliance with the health officer certification requirements.

Indiana sanitary landfills are subject to stringent state regulation. See, e.g., Ind. Code § 13-7-7-5; 329 IAC 2-13-1 through 2-14-24. The landfills are inspected on an intermittent basis. The state prohibits the dumping of untreated infectious waste into these landfills. Similarly, hazardous materials are barred from being deposited, unless they originate from a "small quantity generator" that does not produce more than one hundred kilograms of such hazardous waste per month. 329 IAC 3-3-5. The violation of these regulations can result in penalties to the landfill operator of daily fines up to $25,000.00 and loss of the

---

**10.** This unsavory practice is regulated in Indiana pursuant to another enactment of the

1990 legislature which is not at issue in this case. See Ind.Code § 16-1-28-13.5.

permit to operate the landfill. Hazardous materials that are disposed of in large quantities must be deposited in special hazardous material landfills, which are constructed with substantially different safeguards than sanitary landfills to prevent the escape of dangerous leachate. In order for a determination to be made about whether waste material is infectious or hazardous material, some testing in the nature of laboratory analysis is required.

A transfer station is used for the collection of solid waste from a variety of sources. The waste is delivered to the station by the curbside collectors where it is consolidated from smaller vehicles into a larger one for hauling to a disposal site. The disposal site in most instances is a landfill. In the process of consolidating the waste from various sources, it is packed into the larger vehicle in order to increase the total amount of trash per load that is hauled to the disposal site. The resulting mass of compacted trash takes on the shape of the vehicle in which it is hauled to the disposal site and resembles an enormous loaf, up to ten feet high, twenty feet long and four to eight feet wide. Indiana has approximately forty transfer stations within its borders. Similar transfer stations are located in states outside of Indiana.

In some instances, a compaction operation called a "push pit" is used. This process entails the dumping of the trash from the various sources onto a surface where machinery is used to compact it and then to push it into a vehicle. In some instances, the waste material is baled after it is compacted, that is, it is wrapped with rope or wire. The resulting dense volume of trash is about the size and shape of a hay bale, approximately three feet in length and two feet wide. These bales are then loaded into large over-the-road hauling vehicles for transportation to the disposal site. According to Charles Brown, the only Indiana landfill operator who testified in this proceeding, some waste originating within the State of Indiana and disposed of in Indiana landfills, is baled prior to delivery to the disposal site. Some Indiana transfer stations bale cardboard waste only.

In some Indiana counties, there are rural trash collection sites. These consist of large, unmonitored bins placed at various locations in the county. Residents and businesses can dump their waste in the bins. The bins are subsequently picked up, often by the county, and hauled to a landfill. Generally, neither the hauler nor the landfill operator has an opportunity to know who dumped materials in the bins, or in most instances, who generated the waste.

Recycling centers operate in much the same fashion as transfer stations. Waste material is brought to the center from a variety of sources. The waste is then separated, and materials which can be reused or otherwise recycled for other commercial products, such as paper, glass and aluminum, are removed. The remaining materials are compacted for transportation to a disposal site. There are recycling centers in the various states from which trash is transported in interstate commerce to Indiana.

On-site inspection of baled waste, at a landfill or elsewhere, is not significantly different from the inspection of compacted waste. For such an inspection to be conducted, heavy equipment would be needed to push the compacted trash apart, so that a visual examination of the trash could be made. The trash could not be inspected while it is still in the hauling vehicle because of the compaction and the absence of space for inspectors to move about the trash, as well as because of the limited lighting inside the vehicles. There is also some risk of injury to the inspectors if they are required to move around the tightly packed bales inside the vehicles. Sharp objects are frequently found around the edges of the trash. Various IDEM employees expressed their reluctance to conduct trash load inspections at landfills because of the hazards and discomfort of such inspections. Baled trash is more densely compacted than trash that is merely compacted into a hauling vehicle. Thus, trash baling results in a larger volume of trash being delivered in each load of baled trash than in each load of trash that is merely

compacted; however, the type of equipment and personnel needed to conduct inspections of baled trash is not substantially different.

While Commissioner Prosser takes the position that inspection of solid waste is more easily done at the point of generation, Bruce Palin, an Assistant Commissioner of her agency, is of the opinion that such an inspection can be conducted at the points of generation and disposal with approximately the same degree of difficulty. The evidence indicates that inspection can be accomplished, albeit with some difficulty, at either site.

The health or environmental officer certification required by H.E.A. 1240 would be difficult, if not impossible to obtain. Part of the difficulty lies in the fact that health and environmental officers outside the State of Indiana have as their focus the enforcement of the laws and regulations in force in their respective states. It is also unlikely that such officers would be familiar with the laws of Indiana with respect to infectious waste. Another difficult aspect is the burden of conducting what would amount to an item-by-item inspection of waste to be hauled to Indiana. For example, to certify that none of the waste in the load is subject to regulation as hazardous waste under the federal Solid Waste Disposal Act, the inspector would have to test each item of suspected hazardous waste. The inspector would also have to be informed of the source of the waste if it was in fact hazardous, so that a determination could be made about whether the generator produced more than one hundred kilograms of hazardous waste per month. Otherwise, the waste is exempt from treatment as hazardous waste.

The burden of such an examination must be viewed against the background of all of the duties that such officers have with respect to the enforcement of regulations and laws of their own states. There is no indication that the health and environmental officers of states other than Indiana have any legal obligation to conduct such inspections, either for the purpose of compliance with Indiana law or the law of the states in which they are employed. Thus, even if such officers had the time to conduct such inspections in addition to the performance of their regular duties, it is questionable whether they would perform the inspections.

Indiana environmental officers testified about the discomfort involved performing such inspections and expressed their reluctance to participate in such activities unless ordered to do so.[11] The record does not show that there would be any legal means of compelling non-Indiana officers to conduct the inspections. For that matter, Indiana health and environmental officers are not even required to conduct such examinations by law. Trash loads originating in Indiana are not required to be certified prior to deposit.

Indiana health and environmental officers could conduct inspections of the trash at the landfills prior to dumping; however, this does not mean that it would be an easy task or one for which there would be willing volunteers. Such on-site inspections would be time consuming and additional work for state officers who already have full-time responsibilities. The State of Indiana would incur additional expense if it were to hire additional health and environmental officers to conduct such inspections.

H.E.A. 1240 does not relate the qualifications of the out-of-state health or environmental officers to their ability to conduct the type of investigation which would need to be performed for the certification to reflect that the load of trash was competently examined. In other words, according to H.E.A. 1240, the person providing the certificate must only have responsibility for the protection of the public health or the environment in general, not any special expertise or qualifications in the area of hazardous materials or infectious waste. For example, the statute would permit a commercial kitchen health inspector, com-

---

11. Some inspections of out-of-state trash loads were conducted at several Indiana landfills after this litigation was commenced, but these were conducted under special executive directives, not as a part of the routine duties of the persons participating in the inspections.

pletely untrained in hazardous waste or infectious materials, to provide a certification.

Representatives of both Government Suppliers and Castenova were unsuccessful in obtaining adequate health officer certificates during the short period of time that the requirement was in force prior to the entry of the preliminary injunction. As might be expected, Jack Castenova was told by an employee of the Pennsylvania Department of Environmental Control that as a Pennsylvania health officer, the employee had no obligation or responsibility to inspect or certify a load of waste to be shipped to Indiana. Jack Lynch, a representative of Government Suppliers, was able to find certain health officers in New Jersey who were willing to sign certificates, but upon reviewing the certificates at trial, Commissioner Prosser indicated that the form of the certificates was not in compliance with the Indiana law at issue.

Most of the trash that is transported in interstate commerce to Indiana passes through transfer stations or recycling centers. A majority of these stations and centers receive trash from a variety of sources. For example, a transfer station may receive waste from dozens of municipal garbage collection vehicles. Each of those vehicles may collect waste from scores of homes and commercial establishments. The waste often comes to the stations and centers from more than one political subdivision, town or county. When the stations or centers are located within a reasonable distance of a state line, they may receive waste from both the state in which they are located and from nearby states. This is true of stations and centers located in Indiana as well as in other states.

According to Commissioner Prosser's testimony, "generated" as contained in H.E.A. 1240 means "basically the place where it [the waste] was generated." This court gleans from Prosser's testimony that she interprets the term "generated" to mean the point of origination as opposed to the point of pick-up, for example from a transfer station. She stated that it is not necessary to identify the specific household where the generation occurred, but rather a more general description of the location is sufficient. To Commissioner Prosser, "largest part" in the Act means volume rather than weight. Indiana State Senator William Vobach, one of the principal sponsors of legislation (Senate Bill 66) which led to the compromise legislation ultimately enacted as H.E.A. 1240, reads "generated" to mean the original site at which the waste was created and collected.

Because of the nature of the operations of recycling centers and transfer stations, it is virtually impossible to identify the point of generation of the majority of the trash in any particular load being hauled from a particular center. For example, if the waste comes from residential garbage collection, the actual points of generation would be each of the individual homes from which the trash is gathered. The trash from each home is intermingled in the municipal collection truck and is then further intermingled with the trash from other homes when the collection truck dumps the load at a station or center. Then, various loads are compacted together, further obliterating any identifying characteristics. Whether out-of-state trash is collected from a transfer station or a recycling center, the hauler of the material generally cannot know where the waste material was generated. Depending on the location of these sites, the trash located there may have come from the immediate vicinity or from a nearby state. The trash deposited at these sites is intermingled to such a degree that it is unlikely that a hauler could know the place of generation of the largest part of the trash. It is extremely difficult or impossible, therefore, for the vehicle operator to provide an accurate hauler certificate because collector trucks can cross political subdivisions, including state lines, when making collections and because the collective group of trucks dumping at any station or center may come from more than one political subdivision or state.

Another portion of H.E.A. 1240 dealing with solid waste management reporting requires solid waste haulers who transport trash from locations within the State of

Indiana to locations outside Indiana to maintain records that identify the county and state of origin of the largest part (by volume) of each load of trash. Ind.Code § 13–9.5–11–2(a).[12] These solid waste haulers must also file quarterly reports with IDEM which identify each out-of-state transfer station or disposal facility used and the volume of solid waste from each county and state delivered during the reporting period. Ind.Code § 13–9.5–11–2(b).[13] However, these records and reports do not have to be made under oath, and if the hauler does not collect the trash from the point of origin, presumably curbside, he or she may comply with these requirements by presenting a certification by the owner or operator of any facility from which he or she collected trash which indicates the county and state from which the largest part of the waste originated. This certification, may be based on average figures in accordance with procedures to be established by IDEM. Ind.Code § 13–9.5–11–3.[14] Although not at issue in this case, the same chapter does impose a different reporting requirement on solid waste haulers who transport waste into Indiana. Ind.Code

§ 13–9.5–11–1.[15] The certification by the hauler who imports trash into Indiana does have to be made under oath, but apparently the unsworn certification from the owner or operator of the out-of-state facility where the trash was picked up can also be substituted for the sworn certificate of the hauler.[16]

Under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), generators, haulers and disposers of hazardous materials are required to account for the amount of hazardous materials produced or handled by them through a reporting or manifesting system. 42 U.S.C. §§ 9601–9675. This system tracking of hazardous waste has been implemented by the State of Indiana, and it is relatively uniform throughout all states. If a particular state declines to participate in the tracking of wastes under this law, the federal government requires the making and keeping of these records. In addition, the disposal of hazardous waste is strictly regulated under the federal Resource Conservation and Recovery Act of 1976 (RCRA) and is far more expensive than disposal of non-hazardous

12. Ind.Code § 13–9.5–11–2(a) provides as follows:

After June 30, 1990, a solid waste hauler that collects solid waste in Indiana and takes the solid waste to a transfer station or final disposal facility outside Indiana shall maintain records that identify, for each shipment, the county and state of origin of the largest part of the solid waste by volume.

13. Ind.Code § 13–9.5–11–2(b) provides as follows:

Each solid waste hauler who is required to maintain records under subsection (a) shall file quarterly reports with the department that state the location of each out-of-state transfer station or final disposal facility and identify the volume of solid waste from each county and state taken to the transfer station or final disposal facility during the reporting period.

14. The reporting requirement may be satisfied under Ind.Code § 13–9.5–11–3 as follows:

A hauler required to make a certification or report under section 1 or 2 [IC 13–9.5–11–1 or 13–9.5–11–2] of this chapter concerning the origin of the solid waste that did not collect the solid waste at the point of origin may satisfy the requirements of section 1 and 2 of this chapter concerning a certification or re-

port of origin of the solid waste by presenting a certification from the owner or operator of the facility at which the solid waste was picked up that indicates the county and state of origin of the largest part of the solid waste. The department shall establish procedures that allow the use of average figures in making the certification.

15. Ind.Code § 13–9.5–11–1 requires that:

After June 30, 1990, a solid waste hauler that takes solid waste to a transfer station or a final disposal facility located in Indiana shall, under oath or affirmation, and subject to the penalty for perjury under IC 35–44–2–1, certify to the owner or operator of the transfer station or disposal facility the county and state or origin of the largest part of the solid waste by volume.

16. None of the evidence at trial indicated that the certification requirements of this section satisfy the hauler certification requirements of Ind.Code § 13–7–22–2.7, the constitutionality of which is at issue in this cause. The requirements of both are similar, but not identical. This suit does not challenge the constitutionality of the Solid Waste Management Reporting requirements.

material. It can cost up to $250.00 a ton to dispose of hazardous material.

In 1988, the United States Congress passed the Medical Waste Tracking Act which authorized a two-year pilot tracking program to ensure that medical waste is sent to proper disposal facilities. 42 U.S.C. § 6992 *et seq.* New Jersey, New York and Connecticut were obligated to participate in the program, and the other Great Lakes states, including Indiana, had the option of participating in the program if they chose to do so. Governor Bayh decided that Indiana would not participate in the program. Indiana had developed its own regulatory scheme for tracking medical waste and the federal scheme would preempt the Indiana program. According to the letter sent by Governor Bayh to the Administrator of the Environmental Protection Agency, the Indiana program needed to be in operation so that its effectiveness could be analyzed. The Governor's letter indicated that he felt that it would be premature to alter the present regulatory scheme as of April 1989. The Governor also wrote that the cost of the federal program to Indiana would be difficult to justify in light of the fiscal situation faced by Indiana at that time.

There are differences between the federal and Indiana acts. For example, the federal act covers some medical wastes that the Indiana law does not. The federal law also requires that a manifest accompany each load of medical waste and the Indiana act does not. The focus of the Indiana act appears to be materials that have been deemed capable of transmitting infections, while the federal act is broader in its scope, covering all medical waste. Under the Indiana law, blood in liquid or semi-liquid form is automatically considered infectious waste. Dried blood can be, but is not automatically, deemed infectious. Under Indiana law, the generators of infectious waste are required to treat the waste prior to disposal.

The principal generators of infectious waste in Indiana are hospitals, blood centers, jails, prisons, home health agencies, labs, nursing homes, hospices and ambulatory surgical centers. Prior to trial, no administrative, civil or criminal actions for the improper disposal of infectious waste which had originated outside the State of Indiana had been instituted. Under Indiana regulations, individuals can be generators of infectious waste, e.g., a diabetic who uses syringes and disposes of them in the household garbage, although the Infectious Waste Act does not include individuals among the persons and entities regulated. *Compare* 410 IAC 1–3–13 with Ind. Code § 16–1–9.7–6. According to an Environmental epidemiologist employed by the Indiana State Board of Health, the harm posed by the deposit of infectious wastes in landfills is not substantial, with the exception of sharps,[17] which may puncture the skin of landfill workers.

Commissioner Prosser is concerned that the federal Medical Waste Tracking Act is not effective because she is aware of certain incidents in which medical waste from other states, such as New Jersey and New York, has been delivered to Indiana landfills, despite the Act. She considers the federal act difficult to comply with and also feels that it is human nature to circumvent compliance with such requirements. These situations have caused her to increase the IDEM effort at inspecting sanitary landfills. Commissioner Prosser testified that there is no mechanism in place to impose accountability on those who are predisposed to illegally dump infectious waste in an Indiana landfill. She believes that Indiana can enforce the Indiana Infectious Waste Act against Indiana generators, but she does not have the same confidence as to out-of-state generators or haulers.

IDEM directed the inspection of several loads of trash at landfills on May 24, 1990, and on June 5, 1990. On May 24, 1990, John Hale, an Environmental Scientist at IDEM, was part of a three-person inspection team at Talley Hunt landfill near Wabash, Indiana. The loads inspected contained baled trash which in Hale's opinion

---

**17.** The term "sharp" refers to any sharp object that has been in contact with blood or body fluids. Ind.Code § 16–1–9.7–1. "Sharps" is the plural of this term.

came from outside the State of Indiana. The bales were broken open on the landfill surface by a bulldozer and the contents spread out in a roughly square area approximately fifteen feet by fifteen feet. The waste square was approximately one foot deep. The inspection was difficult work, requiring three workers to be suited up in heavy protective gear on a hot day. The workers raked through the trash and looked for items that were not supposed to be deposited in a sanitary landfill. When a team member spotted an item that was suspicious, the other members would be called over to the spot. If the members thought that the item appeared to be a prohibited item, it would be collected and placed in a sealed container. Hale's group collected various items, including a rubber glove with what appeared to be blood in it and four or five used syringes. Hale delivered these items to the Indiana State Police laboratory on the next day.

On June 14, 1990, Hale participated in a four person inspection team under similar circumstances at the Center Point landfill. On this occasion, Hale's group again discovered various items, including a syringe and some medical tubing. Again, it was Hale's opinion that the loads inspected came from outside Indiana. To some degree, this opinion was corroborated when one of the Hale team members discovered a piece of paper during the inspection that bore the identification of Mount Sinai hospital which is located in New York. Hale also delivered these objects, sealed in containers, to the Indiana State Police laboratory.

On May 24, 1990, Jerome Rud of IDEM worked as part of a four-person team on similar inspections at the Center Point landfill. The trash inspected, in the opinion of Rud, originated outside of Indiana. The inspection technique was much the same as the one used by Hale's group. The Rud group discovered various items of concern, including objects he described as respirator tubing, an evacuator bag, several vials containing a reddish liquid and a hypodermic needle. Martin Harmless, Assistant Commissioner for Solid and Hazardous Waste at IDEM, also participated in the inspection

at the Center Point landfill. His principal role was to collect any items found by the workers and to transport those items to the Indiana State Police laboratory for examination. He accomplished this by placing the items in sealed containers, transporting them to the lab and depositing them there in substantially the same condition in which he received them from the others on the inspection team.

James Romack, a chemist at the Indiana State Police laboratory, examined the various items collected by the Hale and Rud teams. In connection with the Hale team examination at Talley Hunt landfill on May 24, 1990, Romack found dried human blood on various plastic devices and a bandage and liquid blood on two syringes and a glove. Examination of the results of the Rud team inspection disclosed the presence of human blood on two vacutainers, a wound suction evacuator, an alcohol preparation pad, paper materials and gauze pads. The June 14, 1990, inspection results showed dried human blood on a plastic device with attached tubing. None of the items collected were tested for the presence of hazardous materials, infectious qualities or to determine whether they had been treated.

Although the defense contends that these searches were part of stepped-up enforcement efforts, there was no evidence to show that they were part of routine enforcement practices. The inspections appeared to be an effort to gather information for this litigation, or for some similar purpose, and were ordered well after the enactment of the legislation and the initiation of this litigation. In general, the inspections were conducted in a reasonably professional manner. Neither Rud nor Hale were accurate in all details as to the number and description of items observed and seized at each location, nor did Romack's description of the items he examined match the Rud and Hale descriptions "on all fours." However, the collection and preservation processes were sufficiently reliable to permit the admission of the results of the inspections into evidence.

Even after intensive team inspection of the loads of trash, which consumed several hours, Rud indicated that he was not confident that the loads inspected were free from hazardous and infectious waste. This assessment was made after the suspected items had been removed from the loads. Nonetheless, the landfill operators were permitted to place the loads in their dumps. Rud estimated that it would take a team of three inspectors approximately one-half day to adequately inspect one truckload of waste to ensure that it contained no hazardous or infectious material.

IDEM inspectors routinely look for hazardous materials and infectious waste when they conduct inspections of sanitary landfills. In February of 1990, Rick Schroeder, a field inspector for IDEM, conducted a routine inspection of the Clark–Floyd landfill in southern Indiana. This landfill does not accept out-of-state waste. During his inspection, he discovered a syringe and attached needle which were not contained in a puncture resistant container. He suspected that these items were infectious waste. It was later determined that these items had originated from the Floyd County Memorial Hospital located in New Albany, Indiana. In May of 1990, Schroeder conducted a routine inspection of the Warrick County (Indiana) landfill. He saw five or six syringes and needles not contained in a puncture resistant container. Again, he suspected these items to be infectious medical waste. These items were not tested by the Indiana State Police laboratory.

David Feltner, a trucker, testified at trial that in approximately March of 1990, he picked up a truckload of baled trash at a warehouse or transfer station in Indianapolis and attempted to deliver it to the Spring Valley landfill in Indiana. He was turned away by the landfill operator who sent him to the Talley Hunt landfill. The load was dumped there, where Feltner observed that it contained medical-type waste, such as plastic tubing, intravenous bags and bottles. According to Feltner, the bales were not bound by wire or string and appeared to be approximately five feet wide and ten feet long, much larger than the bale size

most often used with trash that originates outside of Indiana. The evidence was not clear regarding whether the trash had been generated inside or outside of Indiana, nor was there any indication that it contained blood in a liquid or semi-liquid form.

### III. *Conclusions of Law*

This court approaches this constitutional challenge to the state statutes with respect for the basic principle that a statute is presumed to be constitutional. *See Bowen v. Kendrick*, 487 U.S. 589, 617, 108 S.Ct. 2562, 2578–79, 101 L.Ed.2d 520 (1988) (reviewing congressional enactment); *Hines v. Elkhart Gen. Hosp.*, 465 F.Supp. 421 (N.D.Ind.), *aff'd*, 603 F.2d 646 (7th Cir. 1979); *cf. Eddy v. McGinnis*, 523 N.E.2d 737 (Ind.1988) (every enactment by the state legislature that is challenged before the Indiana Supreme Court is presumed to be constitutional). However, it is also a basic constitutional principle that a federal court has a duty to review laws for constitutional infirmities and that if a state statute conflicts with the United States Constitution, the former must yield to the latter. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

First, the questions of the standing of the plaintiffs to bring this suit and whether the dispute is not ripe for adjudication will be addressed. A discussion of the effect of the commerce clause on these statutes will follow. Because of the resolution of the commerce clause issues, it will not be necessary to reach the questions raised by the plaintiffs' claim that certain statutory provisions are unconstitutionally vague.

### A. *Standing and Ripeness*

In the decision granting the plaintiffs' motion for a preliminary injunction, this court *sua sponte* raised the issues of standing and ripeness. *Government Suppliers Consolidating Servs., Inc. v. Bayh*, 734 F.Supp. 853, 857–61 (S.D.Ind.1990). The issue was resolved at that stage by a determination that, while it was a "close question," the plaintiffs had met their burden of establishing that the questions presented

were ripe for adjudication and that the plaintiffs had alleged sufficient standing for a preliminary injunction to issue. *Id.* at 859, 861. Nevertheless, the parties were cautioned that the court's "determinations" were "preliminary in nature" and were instructed that at the trial on the merits they would be required to carry their burden of proof on all "relevant legal issues." *Id.* at 857.

■ The issue of ripeness need not be revisited because the evidence at the trial on the merits reaffirmed this court's previous conclusion that, with respect to the three challenged statutory provisions, a substantial controversy of sufficient immediacy and reality exists between parties having adverse legal interests to warrant a determination on the merits. *See id.* at 859–61; *compare Illinois v. General Elec. Co.*, 683 F.2d 206, 209–10 (7th Cir.1982) (holding that the controversy had "real and immediate and not merely hypothetical or remote consequences" for the parties and noting that ripeness is a determination of degree and not of kind) *with Nuclear Eng'g Co. v. Scott*, 660 F.2d 241 (7th Cir. 1981) (holding that the threat of enforcement of a state statute did not create an actual controversy; however, plaintiff was not challenging the constitutionality of the statute). The challenged statutory provisions in this case are not in an evolutionary stage; Indiana officials have pronounced their immediate intent to fully enforce them. These facts were fully evident at the preliminary injunction stage and the relevant legal landscape has not significantly changed since that time.

The only change since the hearing on the request for a preliminary injunction is temporal; the tipping fee is now on the brink of being imposed on the first load of trash to come into Indiana after December 31, 1990.[18] It became evident from the testimony at trial that the State of Indiana will be implementing the tipping fee provision upon its effective date. Representatives of the Governor conveyed a firm conviction of their intent to enforce the tipping fee provision in the manner alleged by the plaintiffs

to be unconstitutional. Finally on this point, the Governor disputed the ripeness of the controversy at the preliminary injunction of this proceeding, but did not renew that contention in the pre- and post-trial briefs. Therefore, this court has not moved from its conclusion that the challenge to the constitutionality of the three provisions of the Act is ripe for a decision.

In contrast to the facts relevant to establish ripeness, the facts necessary for a full consideration of the issue of standing are likely to be incompletely set forth or entirely unaddressed at the preliminary injunction stage. For that reason, a district court ruling on a standing question *sua sponte* or upon a motion to dismiss early in proceedings between adverse parties "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Later in the proceedings, trial courts have been instructed "to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Id.* at 501–02, 95 S.Ct. at 2206–07. If, after an opportunity to substantiate the allegations of its complaint with respect to its standing to pursue the lawsuit, "the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed." *Id.* at 502, 95 S.Ct. at 2207. Because an incomplete picture of the relationship between the plaintiffs, their alleged injuries and the challenged statute was presented at the preliminary injunction stage, this court deems it prudent to revisit the issue of the plaintiff's standing to pursue its claim that H.E.A. 1240 is unconstitutional.

Plaintiffs' complaint throughout alleges that plaintiffs "have been involved in businesses which require them to haul and dispose" of "solid wastes in landfills permitted and/or licensed by the State of Indiana." In addition, at the preliminary injunction hearing, the plaintiffs' attorney

---

18. The tipping fee provision goes into effect on January 1, 1991. Ind. Code § 13–9.5–5–1(a).

stated that he believed the plaintiffs both brokered waste hauling deals and employed truckers who haul waste into Indiana from out-of-state. Despite these representations, however, the evidence at trial showed that the plaintiffs do not themselves haul trash into Indiana nor do they employ people who do so. Rather, the plaintiffs are exclusively trash-brokers who arrange for the importation of trash into Indiana by facilitating contacts between generators of solid waste, independent truck drivers who haul the waste, and Indiana landfill operators. Furthermore, there was no evidence that the plaintiffs have ever paid tipping fees to an Indiana landfill operator.[19] Thus, the plaintiffs' claim of injury rests squarely upon their claim that they will be economically injured by the dislocation in the marketplace that would result from the enforcement of H.E.A. 1240.[20]

The Constitution places limits on those who may seek to use the federal courts as a forum to address their grievances. The limitations found in article III's "case" or "controversy" requirement[21] restrict the "exercise of judicial power ... to litigants who can show 'injury in fact' resulting from the action which they seek to have the court adjudicate." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982).

■ The constitutional "injury in fact" requirement is met when a litigant shows

(1) that it has suffered an actual or threatened personal injury, (2) caused by the challenged activity, (3) for which the court can provide a remedy. *See, e.g., Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. at 758; *City of Evanston v. Regional Transp. Auth.*, 825 F.2d 1121, 1123 (7th Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988); *Simmons v. Interstate Commerce Comm'n*, 909 F.2d 186, 189 (7th Cir.1990).

■ In this case, the evidence has shown that enforcement of H.E.A. 1240 would cause the plaintiffs' business in Indiana to cease. The Governor, however, argues that this is not the type of injury the courts should recognize in a commerce clause case. Relying on *Exxon v. Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), the state contends that this court's responsibility is the "protection of the 'national market place'" and that because "[p]laintiffs are interested in [no] more than protecting their own business practices, they truly lack ... standing."[22]

Presumably, the Governor views the plaintiffs' election to do business in Indiana as a business practice which, if eliminated, would not produce an injury in fact.[23] For some middlepersons or trash-brokers this might be a correct argument. It is possible that a middleperson might be so situated that he or she would not lose any business if the Indiana landfill market was closed to

19. The plaintiffs have not entered into any long-term contracts to dispose of waste. Thus, the higher tipping fee required under the Act would presumably be passed on to any waste producer who might desire to ship waste into Indiana after the effective date of H.E.A. 1240 and would not be paid by plaintiffs.

20. Although not argued, plaintiffs may have some potential criminal liability under the perjury provision of the hauler certification. If the plaintiffs' conduct in brokering trash hauling deals to Indiana would be construed as aiding or abetting the submission of a perjurious certification, Indiana law would permit them to be criminally prosecuted. Ind.Code § 35-41-2-4. However, the analysis which follows concluding that these plaintiffs have standing is not dependent on the plaintiffs' potential concern about criminal prosecution.

21. U.S. Const. art. III, § 2, in relevant part, provides: "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution ... —to Controversies ... between a State and Citizens of another State."

22. The *Exxon* case, however, does not contain a discussion of standing, nor has it previously been viewed as shedding light on the standing inquiry.

23. It is also possible that the Governor's argument is that the right asserted by the plaintiffs' to continue business in Indiana, absent the requirements of H.E.A. 1240, is not a right which falls within the "zone of interests" protected by the commerce clause. This possibility will be considered in due course.

the Nation. Such a trash-broker might simply arrange to have his or her customers' trash dumped elsewhere and pass the increased cost back to his customers. This hypothetical broker, however, was not before this court. The evidence has shown that the brokers who brought this suit will indeed be harmed by the market dislocation that would result from the implementation of H.E.A. 1240.

The defense argument is unacceptable for another reason: it interjects substantive commerce clause analysis into the standing inquiry. This court will look to the "protection of the 'national market place'" as part of the consideration of the merits of the plaintiffs' commerce clause claim. However, this focus plays no part in determining whether a litigant has the type of personal interest in the outcome of the lawsuit which will "assure ... the court that the issues before it will be concrete and sharply presented." *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 955, 104 S.Ct. 2839, 2846, 81 L.Ed.2d 786 (1984) (citing *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)); *see Warth*, 422 U.S. at 500, 95 S.Ct. at 2206 ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"). Indeed, the greater a commerce clause litigant's demonstrated interest in matters other than its "own business practices," the greater may be the likelihood that the litigant is not motivated by personal injury but by a "generalized grievance" which cannot serve as the basis for standing. *See, e.g., Valley Forge Christian College*, 454 U.S. at 475, 102 S.Ct. at 760 (describing policy against adjudicating "generalized grievances"). Thus, plaintiffs' interest in protecting their business practices furthers, rather than detracts from, their claim to have standing.

Plaintiffs will suffer a balance sheet loss if H.E.A. 1240 is permitted to go into effect. Waste hauling business that they would otherwise broker into Indiana landfills will be directed into landfills in other states, and this court has no trouble concluding that the volume of plaintiffs' business will decrease as they struggle to make

contacts and establish a disposal network in other markets. This is precisely the type of economic injury that is consistently found to satisfy the constitutional injury in fact requirement. *See, e.g., Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 267, 104 S.Ct. 3049, 3053, 82 L.Ed.2d 200 (1983) (plaintiffs "entitled to litigate whether ... discriminatory tax has had an adverse competitive impact on their business"); *Village of Arlington Heights v. Metropolitan Hous. Dev.*, 429 U.S. 252, 262, 97 S.Ct. 555, 561–62, 50 L.Ed.2d 450 (1977) ("economic injury" recognized on the basis of money spent for "plans and studies" which may not have been used even if there had been no violation of law); *Association of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (injury found on the basis of probable loss of business due to entry of new competitors into market served by plaintiff); *Marshall & Ilsley Corp. v. Heimann*, 652 F.2d 685, 692 (7th Cir.1981) (injury sufficient to confer standing found on the basis of "a change in the competitive configuration of Milwaukee's banking community"), *cert. denied*, 455 U.S. 981, 102 S.Ct. 1489, 71 L.Ed.2d 691 (1982).

While the plaintiffs' alleged injury is the "but for" result of the elimination of the Indiana landfill market as an available resource to out-of-state trash haulers, the pocketbook injury that results to the plaintiffs might be said to be indirect, in that the Act itself does not apply directly to the actions of the plaintiffs. The certification requirements of the Act are imposed on the truck drivers, not the plaintiffs, and the tipping fees will ultimately be passed on to the generator of the trash. Nevertheless, an injury of the sort suffered by plaintiffs, though only indirectly caused by the challenged statute or regulation, is frequently found to confer standing on the indirectly injured party. *See, e.g., Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320 n. 3, 97 S.Ct. 599, 602 n. 3, 50 L.Ed.2d 514 (1977) (standing found where stock exchanges outside of New York suffered injury when their members were subjected to a discriminatory tax which "diverted busi-

ness from their facilities to exchanges in New York"); *Pierce v. Society of Sisters,* 268 U.S. 510, 536, 45 S.Ct. 571, 574, 69 L.Ed. 1070 (1925) (allowing private schools to assert the first amendment rights of parents and to challenge compulsory education act which "would seriously impair, perhaps destroy, the profitable features of [the schools]"); *Dominion Nat'l Bank v. Olsen,* 771 F.2d 108, 113–14 (6th Cir.1985) ("indirect economic harm resulting from governmental action can constitute injury in fact") (concurring opinion); *Jet Courier Servs. v. Federal Reserve Bank,* 713 F.2d 1221, 1225 (6th Cir.1983) ("[t]he fact that the plaintiffs will suffer indirect rather than direct injury ... does not necessarily deprive them of standing"); *see also Warth,* 422 U.S. at 505, 95 S.Ct. at 2208 ("[w]hen a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights").

While in some cases "the line of causation between the illegal conduct and [the] injury" may be "too attenuated," *Allen,* 468 U.S. at 752, 104 S.Ct. at 3325, to support standing, this court concludes that this is not such a case. Not only have the plaintiffs proved a significant potential for personal injury (the disruption or destruction of their business), but there can be no doubt that this potential for injury is the direct result of the enactment and enforcement of H.E.A. 1240. That being the case, the injury faced by plaintiffs would be eliminated if the Act were ruled unconstitutional. It is, therefore, apparent that the plaintiffs have proved the injury in fact which is the sum and substance of article III's standing requirement.

■■■ Were the satisfaction of article III all that was required to find standing, this court could now proceed to the merits of the constitutional issues presented, however, this court must also be satisfied that no "prudential concerns" justify the denial of standing. *See Duke Power Co. v. Car-*

*olina Envtl. Study Group, Inc.,* 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978); *Warth,* 422 U.S. at 499, 95 S.Ct. at 2205. The three generally recognized prudential limitations to standing are (1) the policy against deciding generalized grievances, *see Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 221–27, 94 S.Ct. 2925, 2932–35, 41 L.Ed.2d 706 (1974); (2) the limitation on allowing a party to assert the rights of third parties, *see Warth,* 422 U.S. at 500, 95 S.Ct. at 2206; and (3) the requirement that the plaintiff fall within the "zone of interest[s]" intended to be protected by the statute, regulation or constitutional provision relied upon, *see Clarke v. Securities Indus. Assoc.,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987); *Valley Forge Christian College,* 454 U.S. at 475, 102 S.Ct. at 760; *Association of Data Processing,* 397 U.S. at 153, 90 S.Ct. at 830. Even though these prudential considerations are often discussed as separate concepts, *see, e.g., Valley Forge Christian College,* 454 U.S. at 475–76, 102 S.Ct. at 760–61, in many cases the inquiry required by each "prudential limitation" will be essentially the same whether the terminology of "generalized grievance," "third party standing," or "zone of interests" is used.

For instance in this case, the zone of interest, third party interest and generalized grievance inquiries overlap. That is so because if it is held that the plaintiffs' interest in being able to broker trash into the Indiana market falls within the zone of interests that the dormant commerce clause was intended to protect, then the plaintiffs have a personal right of action that is neither too general to be enforceable nor dependent upon the rights of any party not before this court.

It has been said that the "zone of interests standard ... requires some indicia—*however slight*—that the litigant before the court was intended to be protected, benefited or regulated by the statute under which suit is brought." *Copper & Brass Fabricators Council, Inc., v. Department of the Treasury,* 679 F.2d 951, 952 (D.C.Cir.1982) (emphasis added). In many cases a court may find the appropriate indicia in the leg-

islative history of the statute relied upon. However, the dormant commerce clause has no legislative history as such. It is a creature of the courts implied out of the "great silences of the Constitution," *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949), in order to promote the "free trade" and commercial "interdependence of the states" that have long been considered key aspects of our charter of government. *Id.*

Given that the dormant commerce clause's limitations on state power have been judicially implied, were it writing on a clean slate, this court might have been slow to find that the dormant commerce clause invested great numbers of potential litigants with federally ensured rights. However, this area of law has been well developed by the Supreme Court, which has already decided that "the Commerce Clause [secures a right] to engage in interstate commerce free of discriminatory" practices. *Boston Stock Exch.*, 429 U.S. at 320 n. 3, 97 S.Ct. at 602 n. 3; *accord Dominion Nat'l Bank*, 771 F.2d at 114 (recognizing "constitutional right to engage in interstate commerce free from discriminatory taxes that clearly affect their businesses") (concurring opinion).

Thus, this court is bound by Supreme Court precedent to find that the zone of interests protected by the commerce clause is a broad "right to engage in interstate commerce free of discriminatory" practices. It appears that this "right" confers upon any potential litigant who has suffered an "injury in fact" as the result of a dormant commerce clause violation the right to sue in federal court to enjoin continued violations. Under *Boston Stock Exchange* all such litigants, including plaintiffs in this case, fall within the "zone of interests" protected by the commerce

clause. While this court perceives that an overly broad interpretation of the zone of interests standard applied in the *Boston Stock Exchange* case might be an unnecessary extension of the doctrine of standing applicable in commerce clause cases,[24] this court does not hesitate to find standing in this case because, in addition to meeting the zone of interests test, plaintiffs have satisfied the other traditional prudential concerns, irrespective of the zone of interests test.

After five days of trial on the merits of the constitutional issues this court has found that the plaintiffs properly framed the issues and presented them with extraordinary adversarial zeal. *See Secretary of State of Maryland*, 467 U.S. at 956, 104 S.Ct. at 2846–47; *Craig v. Boren*, 429 U.S. 190, 194, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1976). The vigor with which a plaintiff has advocated its cause is particularly important where the court finds that there were other classes of potential plaintiffs who might have brought suit but did not. *Id.*

Other persons who might have challenged H.E.A. 1240 include East Coast businesses and municipalities who regularly ship trash to be deposited in Indiana, truck drivers who haul trash into Indiana and Indiana landfill owners and operators. In each situation, however, countervailing interests and concerns can be identified which might prevent these potential parties from ever testing the constitutionality of the statute.

In the case of out-of-state waste generators, the cost of litigation in relation to the hoped for benefit and their distance from this state weigh against a likelihood that they would bring suit. The individual truck drivers themselves often obtain driv-

**24.** Indeed, because every citizen is arguably harmed in fact by a violation of the commerce clause, such a broad view of the zone of interests concept in commerce clause cases seems to clash with the established principle "that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court." *Allen*, 468 U.S. at 754, 104 S.Ct. at 3326. The view of the zone of interests test underlying the

reasoning of the *Boston Stock Exchange* case may even be in conflict with article III itself. *See Valley Forge Christian College*, 454 U.S. at 483, 102 S.Ct. at 764 ("assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning").

ing assignments on an intermittent basis and are unlikely to know when or if they would return to Indiana with a load of trash. The transient nature of the trucking business could place a driver in Indiana one day with a load of trash, and in Colorado the next with a load of lumber. The evidence did not indicate that the truckers had regular contracts to haul trash to Indiana. On the contrary, it appears that drivers are assigned such trips on an "as needed" basis whenever a broker puts the disposal deal together. It is unlikely that a trucker who occasionally drives a load of trash here would have sufficient resources to pursue something of such marginal and unpredictable value as a commerce clause action against a state government. Besides, without some tangible assurance that a particular trucker would have a future expectation of hauling loads here, his standing to bring a constitutional challenge to the Act might also be suspect and the transitory nature of the business would enable the Act to evade constitutional scrutiny.

Finally, with indications that public sentiment was running high against them, landfill owners and operators themselves were, undoubtedly, not anxious to publicly oppose the governor and the state's new environmental laws. In addition, all potential litigants would be likely to give pause before willingly assuming the notoriety and discovery involved in this lawsuit, which has brought to the further attention of the public such unsavory practices as back-hauling, where fruit and other edibles were transported from Indiana back East in the same trucks used to carry refuse to Indiana.

The likelihood that rights would go unvindicated absent the intervention of a third party has often been deemed a sufficient reason to allow a litigant to assert the unrepresented third party's rights and interests. *See Secretary of State of Maryland,* 467 U.S. at 956, 104 S.Ct. at 2846

("where practical obstacles prevent a party from asserting rights on behalf of itself ... the Court has recognized the doctrine of *jus tertii* standing"); *Craig v. Boren,* 429 U.S. 190, 195, 97 S.Ct. 451, 455–56, 50 L.Ed.2d 397 (1976); *Eisenstadt v. Baird,* 405 U.S. 438, 446, 92 S.Ct. 1029, 1034–35, 31 L.Ed.2d 349 (1972); *Dominion Nat'l Bank,* 771 F.2d at 114 (concurring opinion).

In the *Boren* case the Supreme Court allowed a female beer vendor to assert the equal protection rights of 18–21 year old males in a challenge to an Oklahoma law forbidding the sale of 3.2% beer to 18–21 year olds of the masculine gender. That court rested its holding in part on the proposition that, "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Boren,* 429 U.S. at 195, 97 S.Ct. at 456. Similarly, the plaintiffs at bar are entitled to advocate the rights of waste generators, waste haulers and landfill operators "who seek access to [plaintiffs'] ... function." *Id.* There can be no doubt that each of those parties can claim the benefit of the constitutional guarantee at issue. Thus, whether in their own right or as an advocate for the rights of others, plaintiffs have standing to pursue their constitutional claims before this court.[25]

Having determined that these plaintiffs have standing and that this cause of action is ripe for a decision, this court will address the merits of the plaintiffs' constitutional claims. This court has jurisdiction pursuant to 28 U.S.C. § 1331, in that this matter is a civil action arising under the United States Constitution; and 28 U.S.C. § 1343, in that the matter seeks to redress the deprivation under color of state law of rights secured to the plaintiffs by the United States Constitution.

### B. *Commerce Clause*

■ The commerce clause of the United States Constitution grants Congress the

---

**25.** The facts of this case do not support a claim that the plaintiff's concerns amount "only to a generalized grievance shared by a large number of citizens in a substantially equal measure." *Duke Power,* 438 U.S. at 80, 98 S.Ct. at 2634. Rather, the impact of Indiana's new statute hits hardest those who are involved in the economic enterprise of transporting waste into Indiana for depositing. These parties have a justiciable grievance which may be pursued in this court.

power "[t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. While the clause is silent as to how much power a state retains to regulate economic activities within its borders, it is well-settled that the commerce clause limits a state's power to erect barriers against interstate trade.[26] *See, e.g., Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 35, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980); *Hughes v. Oklahoma*, 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979); *H.P. Hood & Sons, Inc.*, 336 U.S. at 535, 69 S.Ct. at 663 ("[T]his Court has advanced the solidarity and prosperity of this Nation by the meaning it has given to these great silences of the Constitution."). In the context of a commerce clause case, Justice Cardozo observed that the Constitution "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935). Thus, the clause has been applied to assure that no state can thwart the ideal that the basic economic unit is the nation and that "the future of our Nation depends not on how certain parts of it fare but on how it does as a whole." *Dutchess Sanitation Serv., Inc. v. Town of Plattekill*, 51 N.Y.2d 670, 435 N.Y.S.2d 962, 964, 417 N.E.2d 74, 76 (1980). Indeed, Indiana businesses have benefitted from this use of the dormant commerce clause. *New Energy Co. v. Limbach*, 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988) (Court strikes down an Ohio tax credit law that exempted from taxation the sale of Ohio-produced ethanol on grounds that the law discouraged the sale of Indiana-produced ethanol in Ohio).

■ This limitation on state regulatory power, however, is not absolute. The states retain authority under their general police powers to regulate matters of legitimate local concern even though interstate commerce is affected. *Lewis*, 447 U.S. at 36, 100 S.Ct. at 2015; *Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986). When such a state regulation is challenged as a violation of the dormant commerce clause, it will be subjected to one of two tests, depending on the discriminatory nature of the statute. The first test applies if a statute is discriminatory on its face or in practical effect. The state bears the burden of justifying the discrimination by showing the following: (1) the statute has a legitimate local purpose; (2) the statute serves this interest; and (3) nondiscriminatory alternatives, adequate to preserve the legitimate local purpose, are not available. *See Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354, 71 S.Ct. 295, 297–98, 95 L.Ed. 329 (1951). This court will refer to this test as the "elevated scrutiny test."

■ The Supreme Court stated the second commerce clause test in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970): "[w]here the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." This court will refer to this test as the *"Pike* test."

■ At the outset, the Governor argues that commerce clause analysis does not even apply because the items that the challenged statutory provisions attempt to regulate, i.e., out-of-state infectious and hazardous waste, are undesirable substances

**26.** Congress may authorize the states to engage in regulation that the commerce clause would otherwise prohibit. *See South–Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91, 104 S.Ct. 2237, 2242, 81 L.Ed.2d 71 (1984) (Congress's authorization must be "unmistakably clear"). In this case, the Governor does not assert that a federal enactment is required in order to vest him with the authority to regulate the interstate shipment of solid waste. Instead, he contends that the challenged statute was enacted pursuant to the state's police power to regulate matters of legitimate local concern.

that the state should be able to restrict under the reasoning of the quarantine cases. *See Illinois v. General Elec. Co.*, 683 F.2d 206, 214 (7th Cir.1982) (noting that the "quarantine cases" treat interstate commerce in "bads" as not commerce at all), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983). Under the quarantine theory, the Supreme Court has recognized the states' authority to restrict or even ban the importation of intrinsically undesirable products. *See, e.g., Clason v. Indiana*, 306 U.S. 439, 442, 59 S.Ct. 609, 611, 83 L.Ed. 858 (1939) (upholding Indiana's prohibition against interstate transportation of dead animals because "obvious purpose of the enactment [was] to prevent the spread of disease and the development of nuisances"); *Asbell v. Kansas*, 209 U.S. 251, 28 S.Ct. 485, 52 L.Ed. 778 (1908) (diseased cattle); *Reid v. Colorado*, 187 U.S. 137, 23 S.Ct. 92, 47 L.Ed. 108 (1902) (diseased cattle and horses). In *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), however, the Supreme Court clearly held that the interstate movement of solid and liquid wastes is commerce. In that case, an out-of-state user of a New Jersey disposal site challenged a New Jersey statute prohibiting the importation of most out-of-state waste. One of the asserted purposes of the New Jersey statute, like the asserted legitimate local purpose for the challenged Indiana provisions, was the protection of the health of the state's citizens. The

Court, however, stated that "[a]ll objects of interstate trade merit Commerce Clause protection; none is excluded by definition at the outset." *City of Philadelphia*, 437 U.S. at 622, 98 S.Ct. at 2534. The Court distinguished the quarantine cases as involving only those items whose "worth in interstate commerce was far outweighed by the dangers inhering in their very movement...." *Id.* Then the Court concluded that the innate danger of the solid and liquid waste did not outweigh its worth in interstate commerce; therefore, any restriction on such waste was subject to commerce clause analysis.[27] *Id.* at 629, 98 S.Ct. at 2538. Subsequently, the Seventh Circuit found that the importation of nuclear waste is commerce that does not fall within the quarantine cases, *Illinois v. General Elec. Co.*, 683 F.2d at 214, and the Eleventh Circuit found that the importation of hazardous waste is commerce that does not fall within the quarantine cases, *National Solid Wastes Management Assoc. v. Alabama Dep't of Envtl. Management*, 910 F.2d 713, 720–21 (11th Cir.1990).[28] While it appears that no court has addressed the question of whether the worth of infectious waste in interstate commerce is outweighed by the dangers in its movement so as to bring such waste within the quarantine cases, this court does not conclude that the interstate movement of infectious waste can be distinguished from the interstate movement of nuclear, hazardous or municipal solid waste.[29] The

27. Commentators have criticized the Court's analysis of the quarantine cases. *See, e.g.,* Campbell, *State Ownership of Hazardous Waste Disposal Sites: A Technique for Excluding Out-of-State Wastes?*, 14 Envtl.L. 177, (1983); Maltz, *How Much Regulation Is Too Much—An Examination of Commerce Clause Jurisprudence*, 50 Geo.Wash.L.Rev. 47, 72–74 (1981); Maltz, *The Burger Court, The Commerce Clause, and The Problem of Differential Treatment*, 54 Ind.L.J. 165 (1979). While the Court's discussion of the quarantine cases may be intellectually unsatisfying to some, this court is bound by the holding of *City of Philadelphia,* which is clearly applicable in this case.

28. For a recent discussion of other reported cases that have applied the dormant commerce clause doctrine to both solid and hazardous waste bans, see Stone, *Supremacy and Commerce Clause Issues Regarding State Hazardous*

*Waste Import Bans,* 15 Colum.J.Envtl.L. 1 (1990).

29. The only post-*City of Philadelphia* quarantine case is *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, which upheld a total ban on importation of baitfish to prevent the introduction of disease that was not present in the state. *Maine v. Taylor* is not controlling in this case. Some courts have tried to distinguish, with varying persuasiveness, the holding of *Maine v. Taylor* in the context of statutory regulations on the importation of waste. *See National Solid Wastes Management Assoc.,* 910 F.2d at 720–21; *Industrial Maintenance Serv., Inc. v. Moore,* 677 F.Supp. 436, 442–44 (S.D.W.Va.1987). It appears to this court, however, that the Supreme Court simply treats state regulations restricting the disposal of waste as negatively impacting a national problem. Because of the commerce

record in this case simply does not support such a conclusion.

It should be noted that the terminology used to describe the waste can be subtly misleading. The Governor focuses on the "hazardous waste" and "infectious waste" portions of the Act in urging the court to apply the quarantine cases here. However, these descriptive labels suggest more ominous connotations than might be deserved. Waste materials that are deemed "infectious" by legal definition may or may not pose a greater danger of causing infection or other harm than waste not falling under that legal definition. Under Indiana law, a wide range of materials, often found in a medical setting, are defined as "infectious." All that is required is that the materials in question must be "capable of transmitting a dangerous communicable disease." Ind.Code § 16–1–9.7–3. In fact, the infectious waste laws apply only to certain persons and facilities, such as hospitals, mortuaries and medical treatment centers. Ind.Code § 16–1–9.7–6. Consequently, the disposal of a used syringe by a hospital creates infectious waste, and the curbside disposal of an identical object by an out-patient administering his or her own medication at home does not. In other words, simply labelling waste as infectious should not lead to the conclusion that waste not labelled as infectious is disease-free.

"Hazardous materials" are also subject to different treatment depending on the source of the materials. Generators of more than one hundred kilograms per month of waste materials categorized as hazardous can dispose of those wastes only at hazardous waste disposal sites. On the other hand, a generator who produces no more than one hundred kilograms of the same hazardous waste materials can dispose of those wastes in an Indiana sanitary landfill. In fact, if two such generators, or any number for that matter, each produce just one hundred kilograms of hazardous waste per month, they can all dispose of their hazardous waste in the same Indiana sanitary landfill, perhaps even in the same load of trash. At the same time, a single generator who produces just one hundred and one pounds of the same type of waste materials per month must dispose of that waste at a hazardous waste disposal site. The point is, the challenged provisions of the Act treat all out-of-state trash as though it is harmful material, regardless of its true nature. The imported trash may or may not contain the dangerous materials. The trash may contain the prohibited materials, but not be dangerous at all. Yet, the same is true of trash originating within Indiana. The fundamental basis of the quarantine cases is that the matters legally stopped at state borders are materials subject to a measurable, identifiable harm, and are not subject to legitimate commercial trade within the state. The harm which can be quarantined cannot be created by label alone. The evidence in this case does not support a differentiation in the treatment of Indiana and non-Indiana trash.

If the quarantine cases were applicable here, the commerce effectively stopped by these regulations would be all out-of-state trash shipped into Indiana. Both "safe" and "dangerous" trash is reached. Indiana has not even closed its landfills to all "dangerous" Indiana trash, to say nothing of all "safe" Indiana trash. The purpose of the commerce clause is to prohibit one state from prohibiting or deterring the residents of other states from sharing in the commerce available in that state. Indiana landfills still do a booming business in the disposal of trash. Under the facts presented to the court, the plaintiffs cannot be restricted from that business. The plaintiffs do not seek to prohibit Indiana from regulating the disposal of hazardous or infectious materials if it is done in a constitutional, evenhanded manner.

Thus, according to the controlling precedent, the quarantine cases do not apply, and the challenged statutory provisions clearly regulate items within interstate

clause, states are not able to erect barriers to the effective functioning of a national economy

and, in effect, to isolate themselves from a nationwide concern.

commerce.[30] In the following discussion, therefore, this court will apply the appropriate commerce clause test to each of the three provisions of the state statute, beginning with the tipping fee provision.

### 1. *Tipping Fee Provision*

█ Under the tipping fee regulation[31], which is scheduled to go into effect on January 1, 1991, Indiana assesses a fee on every ton of trash that is deposited in a final disposal facility in Indiana. Ind.Code § 13–9.5–5–1. The lowest fee that will be charged under the schedule is $0.50 per ton, which is applied to all trash generated in the state of Indiana. Trash generated outside the state is assessed a variable fee that depends on the total cost that would have been charged if the trash had been deposited at the out-of-state final disposal facility[32] nearest its point of generation. The evidence establishes that because out-of-state trash primarily comes from states in which the landfill charge is markedly higher than the typical Indiana landfill charge, out-of-state trash will be assessed a significantly higher tipping fee than the minimum $0.50 per ton tipping fee, which is imposed on in-state trash.[33]

This court finds that the tipping fee is discriminatory in practical effect, based on the evidence, because it imposes a greater burden on out-of-state trash than on in-state trash.[34] Thus, the elevated scrutiny

**30.** Commerce clause analysis might not apply when a government entity is a market participant. The challenged state statutes at issue in this case do not distinguish trash that is being dumped in privately owned landfills as opposed to trash that is being dumped in government owned landfills. Some courts, however, have distinguished *City of Philadelphia* as only applying in the context of an action challenging the regulation of privately owned landfills, not publicly owned landfills. *See Waste Aid Sys., Inc. v. Citrus County*, 613 F.Supp. 102 (M.D.Fla.1985) (upholding as constitutional a county's ban on acceptance of out-of-county waste at a county-owned and operated landfill); *Shayne Bros., Inc. v. District of Columbia*, 592 F.Supp. 1128 (D.D.C.1984) (upholding as constitutional a local regulation prohibiting the disposal of waste generated outside the District in any of the disposal facilities operated by the District unless prior arrangements for acceptance were made with the Commissioner). Some commerce clause scholars have urged such ownership as an alternative for states and municipalities to allow limitation of the disposal of out-of-state waste. *But see* Campbell, *State Ownership of Hazardous Waste Disposal Sites: A Technique for Excluding Out-of-State Wastes?*, 14 Envtl.L. 177 (1983) (concluding that an attempt to exclude or limit the disposal of out-of-state waste by a state that requires all landfill sites to be state-owned will be held invalid under the commerce clause).

**31.** The statutory provision setting forth the method for computing the tipping fee, Ind.Code § 13–9.5–5–1(a), reads as follows:
(a) Beginning January 1, 1991, a fee is imposed on the disposal or incineration of solid waste in a final disposal facility in Indiana. Except as provided in section 6 [IC 13–9.5–5–6] of this chapter, the amount of the fee is as follows:
(1) For solid waste generated in Indiana, fifty cents ($0.50) a ton.

(2) For solid waste generated outside Indiana, the greater of the following:
(A) The cost per ton of disposing of solid waste, including tipping fees and state and local government fees, in the final disposal facility that is closest to the area in which the solid waste was generated, minus the fee actually charged for the disposal or incineration of the solid waste by the owner or operator of the final disposal facility in Indiana.
(B) Fifty cents ($0.50).

**32.** The fee charged out-of-state solid waste by the State of Indiana through the tipping fee provision includes the per ton tipping fee charged by the out-of-state landfill located closest to the area in which the waste was generated, plus the per ton state and local government fee taxed by the state in which the out-of-state landfill is located, and the per ton tipping fee charged by the Indiana landfill operator.

**33.** The typical East Coast landfill charge is above $100.00 per ton, while the typical Indiana landfill charge is around $12.00 per ton.

**34.** At first glance, the tipping fee provision appears to be discriminatory on its face because its effect is so obvious. The evidence at trial shows that the out-of-state waste brokered by these plaintiffs comes from East Coast states where the cost per ton of disposal is much greater than the cost in Indiana. Thus, the formula for calculating the tipping fee for out-of-state waste results in the imposition of a much higher tipping fee for disposal of such waste than the $0.50 per ton fee charged for disposal of in-state waste. However, the statute does provide that disposers of waste generated outside Indiana must pay a tipping fee based upon the formula or $0.50 per ton, *whichever is greater.* Ind. Code § 13–9.5–5–1(a)(2). Thus, it is possible for the disposal of out-of-state waste to be charged the same as the disposal of in-

test will be applied to determine the constitutionality of the tipping fee provision. Under the elevated scrutiny test, the burden of justifying the tipping fee statute shifts to the Governor, who must prove by a preponderance of the evidence that the statute has a legitimate local purpose, that the statute serves this interest, and that alternative means could not promote this purpose as well without discriminating against interstate commerce. *See Hughes,* 441 U.S. at 336, 99 S.Ct. at 1736. H.E.A. 1240 must clear each hurdle to survive a commerce clause challenge.

The Governor asserts that the state's legitimate local purpose behind the tipping fee is to protect the health and welfare of the citizens of the state of Indiana. Clearly, the health and welfare of a state's citizens is a legitimate local concern. *See, e.g., Maine v. Taylor,* 477 U.S. at 151, 106 S.Ct. at 2454 (noting that a state retains broad authority to protect the health and safety of its citizens and the integrity of its natural resources); *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 670, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981) (regulating highway safety is a matter of traditional local concern); *Dean Milk Co.,* 340 U.S. at 353, 71 S.Ct. at 297 (regulating milk products is within the legitimate interest of the safety, health and well-being of the local community).

In response to the Governor's asserted interest, the plaintiffs do not dispute the legitimacy of grounding state laws on the promotion of health and safety. Instead, the plaintiffs argue that concerns over health and safety did not motivate the Indiana legislature when it enacted the tipping fee provision. Rather, the plaintiffs contend that the government's purpose was "economic isolationism"—that the General Assembly and the Governor simply sought to close Indiana's borders to the national problem of solid waste disposal. Economic protectionism, the plaintiffs correctly argue, is an illegitimate state interest. *See City of Philadelphia,* 437 U.S. at 626, 98 S.Ct. at 2536. According to the plaintiffs, Indiana's interest in public health and safety is a "post hoc" rationalization for the law that did not surface until after this lawsuit was filed. The record in this case is full of evidence to support this argument. The Governor and members of his administration made a number of statements that evince an objective of limiting, or perhaps eliminating, the deposition of out-of-state trash in Indiana. Even members of the opposition Republican party may share this goal.[35]

Proving this fact, however, does not mean that it is relevant to this case. Courts and commentators have debated whether evidence of an illegitimate legislative motive can be used to strike down a state law. "[T]he consideration of motive is complicated by the fact that it is altogether possible for a law which is the ex-

state waste, i.e., $0.50 per ton, if the total cost that would have been charged if the out-of-state waste had been disposed of at the out-of-state disposal site nearest the point of generation would be less than $0.50 per ton. There is no evidence that this hypothetical location exists and given the cost of hauling trash, it is unlikely that anyone would dispose of out-of-state trash in this state if the cost of disposal at a closer site is less or the same as disposal in Indiana. Nonetheless, the statute is not discriminatory on its face. The evidence proved that the practical effect of the tipping fee provision will be the imposition of a much higher fee on out-of-state waste being disposed of in Indiana than the fee imposed on the disposal of in-state waste. It makes no difference whether the tipping fee provision is discriminatory in practical effect or discriminatory on its face. The elevated scrutiny test applies to both.

**35.** The plaintiffs focused primarily on statements made by the Governor and members of his administration in their presentation on this point. However, H.E.A. 1240 did not become law merely because the Governor wanted it to be enacted. In the State of Indiana, even a Governor whose political party "controls" both houses of the legislature is rarely so blessed. Governor Bayh's political party did not have a majority of the members of either chamber of the General Assembly when this law was enacted, and the final form of the bill was passed by unanimous votes in both houses. The Act was clearly the product of compromise among the House and Senate sponsors and the Governor. It clearly had bipartisan support. Statements made by individual legislators should also carry a good deal of weight if the motives behind legislation are to be examined, perhaps more weight than the statements of the Governor who legally can only sign or veto the bill.

pression of a bad motive to be a good law." Tussman and ten Brock, *The Equal Protection of the Laws*, 37 Calif.L.Rev. 341, 360 (1949); *see also* Ely, *Legislative & Administrative Motivation in Constitutional Law*, 79 Yale L.J. 1205 (1970). In the context of a first amendment challenge to a congressional statute, the Supreme Court observed as follows:

> What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork. We decline to void ... legislation ... which could be reenacted in its exact form if the same or another legislator made a "wiser" speech about it.

*United States v. O'Brien*, 391 U.S. 367, 383–84, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968).

As this court made clear in the Entry Denying Plaintiffs' Motion To Reconsider Magistrate's Entry dated June 20, 1990, recent Supreme Court commerce clause opinions have discussed lawmakers' motives, but no collection of Justices has yet grounded a majority opinion on the conclusion that the secret motive of the lawmakers was illegitimate. *See, e.g., Maine v. Taylor*, 477 U.S. at 148–49, 106 S.Ct. at 2452–53; *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270–71, 104 S.Ct. 3049, 3054–55, 82 L.Ed.2d 200 (1984); *Kassel*, 450 U.S. at 681, 101 S.Ct. at 1321–22 (Brennan, J., concurring) (criticizing both the plurality and the dissenting opinions for failure to examine legislative motive); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 n. 15, 101 S.Ct. 715, 727 n. 15, 66 L.Ed.2d 659 (1981); *Hughes*, 441 U.S. at 338 n. 20, 99 S.Ct. at 1737 n. 20; *Hunt*, 432 U.S. at 350–53, 97 S.Ct. at 2445–47; *see also Atlantic Prince, Ltd. v. Jorling*, 710 F.Supp. 893, 901–02 n. 19 (E.D.N.Y.1989).

■ Furthermore, even if Governor Bayh and others desire to limit or eliminate the deposition of out-of-state trash in this state, such a goal does not necessarily run afoul of the commerce clause. A vital part of the Governor's job is communication with the citizens of the state on the vital issues of the day, and the volume of trash being dumped in the landfills in the state surely fits into that category. Governor Bayh followed up his public statements alluding to the limitation or elimination of out-of-state waste with action in the very forum where the authority for such regulation can be granted: the Congress of the United States. Interstate commerce can be regulated by federal legislation and not by state legislation, unless the Congress grants that authority. This court does not read the broad public statements about out-of-state trash made by the Governor and members of his administration to be specifically directed at H.E.A. 1240 in all respects. There is nothing constitutionally wrong with a broad-based attack on a state's problem involving interstate commerce, as long as the correct volleys are fired in the appropriate places. It would be unduly cynical for this court to assume that whenever the Governor's administration spoke of limiting or eliminating out-of-state trash, that it meant that it intended to do so in an unconstitutional manner. A more plausible inference, given the fact that the Governor was a practicing lawyer before election to the highest office in this state, and that his administration is staffed by many lawyers, is that the Bayh administration intends to achieve that goal through many methods, and hopefully through ones which are constitutional. If this is not the case, there would have been little reason for the Governor to ask Congress for more authority to deal with this problem.

■ Thus, this court concludes that even if the Governor and the General Assembly had illegitimate motives in signing and enacting the statute, "bad" motives cannot invalidate an otherwise valid law. Where a valid state interest for the law is discovered after the law's enactment, the law can be upheld on this new basis, even though the valid interest was not at the forefront of the legislators' minds when they voted for the bill, or the Governor's mind when he signed it into law. *Cf. United States v. Marshall*, 908 F.2d 1312, 1325 (7th Cir.1990) (en banc) ("Even laws that resulted from mistakes in the drafting pro-

cess or ignorance in the halls of Congress survive if a rational basis may be supplied for the result."); *Northside Sanitary Landfill, Inc. v. City of Indianapolis,* 902 F.2d 521 (7th Cir.1990). Therefore, an analysis of the actual motives of Indiana's lawmakers and executives is irrelevant to the outcome of the commerce clause inquiry. *Accord Primary Care Physicians Group, P.C. v. Ledbetter,* 102 F.R.D. 254, 257 (N.D.Ga.1984); *Apel v. Murphy,* 70 F.R.D. 651 (D.R.I.1976).

Since the state has met its burden of articulating a legitimate local purpose, this court must next determine whether the tipping fee provision serves this interest to a substantial extent. While the Governor's mere assertion of a legitimate state interest is enough to meet the first element of the elevated scrutiny test, he must go further to clear the next hurdle. The court must determine what the practical impact of the law is, *Hughes,* 441 U.S. at 336, 99 S.Ct. at 1736, and the Governor bears the burden of presenting to the court evidence to show that the statute actually serves his asserted interest to a substantial extent. *Kassel,* 450 U.S. at 680–81, 101 S.Ct. at 1321 (Brennan, J., concurring) (state must show only that the regulation is not wholly irrational in light of its purpose).

■ The Governor argues that the state's interest in health and safety is advanced by the tipping fee because it generates funds used for the clean-up of hazardous waste sites in Indiana. The Indiana statute mandates that the tipping fees collected on out-of-state trash be placed into the hazardous substances response trust fund. This trust fund was established by Ind.Code § 13–7–8.7–2. The money in this fund is to be used to pay for the removal of hazardous substances that are discovered in Indiana waste disposal sites. *See* Ind. Code § 13–9.5–5–1(b). Tipping fees collect-

ed from in-state trash are placed in a different state fund—the state solid waste management fund, which was established by Ind.Code § 13–9.5–5–2. The money in this fund is to be use to promote recycling. *Id.*

While the statute does direct that the funds in the hazardous substances response trust fund must be used in a way that will tend to advance the state's interest in health and safety, the tipping fees provision cannot generate any money for this trust fund unless out-of-state waste is actually dumped in Indiana. Given the significant tipping fee assessed against almost all out-of-state trash, only economically foolish haulers would ever bring their trash into the state. The fees provision erects a virtual economic barrier to the importation of out-of-state trash. Thus, the hazardous substances response trust fund will go unfunded by the tipping fees provision,[36] and the Governor's interest in health and safety will not be advanced by the tax on out-of-state trash. This barrier is even more suspect because there is no evidence to support any connection between the amount of harm threatened by the out-of-state waste and the size of the likely tipping fee to be charged if any such trash would be brought here.

■ Another basis for the tipping fee may exist, although not asserted by the Governor. After all, taxes can be used to accomplish two goals—to raise revenue and to deter undesirable behavior.[37] By heavily taxing the importation of out-of-state trash, Indiana has effectively reduced to zero the amount of trash that will be imported. As a direct result and to a substantial extent, scarce Indiana landfill space will be preserved and the overall need for the hazardous waste clean-up fund will be reduced— both of which are legitimate state objectives. *See City of Philadelphia,* 437 U.S.

---

**36.** This result may not have been unexpected by the General Assembly. The statute that lists the sources of revenue for the hazardous substances *response trust fund,* Ind.Code § 13–7–8.7–3, was not amended to include the tipping fees imposed on imported trash under Ind.Code § 13–9.5–5–1.

**37.** While not all taxes are levied with the purpose of reducing the frequency of the activity or thing taxed (the income tax is a good example), some taxes are intended to reduce the frequency of the activity taxed. "Sin" taxes on the sale of cigarettes and alcohol, for example, are intended both to raise revenue and to reduce the public's consumption of these goods.

at 626, 98 S.Ct. at 2536–37 (preserving the life of a local landfill and preventing the release of hazardous wastes to the environment are both legitimate means of advancing a state's general interest in the health and safety of its citizens). Although the Governor does not advance this argument, the evidence supports this conclusion. Thus, this court concludes that the tipping fees provision does advance to a substantial extent the state's general interest in the health and safety of its citizens.

However, the third element of the elevated scrutiny test, i.e., that there are no nondiscriminatory alternatives to achieve this governmental interest, proves to be an insurmountable hurdle for the tipping fee. Unlike *Maine v. Taylor*, in which the alternatives were no more than "abstract possibilit[ies]," *Maine v. Taylor*, 477 U.S. at 147, 106 S.Ct. at 2452, Indiana clearly has reasonable nondiscriminatory alternatives available to achieve its stated purpose. For example, the state could equalize the tipping fee by charging a flat fee for both in-state and out-of-state waste so that the flow of all waste into landfills within Indiana is slowed. *See City of Philadelphia*, 437 U.S. at 626, 98 S.Ct. at 2536–37; *Al Turi Landfill, Inc. v. Town of Goshen*, 556 F.Supp. 231, 238–39 (S.D.N.Y. 1982). Furthermore, the state could tie the amount of the tipping fee to the state's costs rather than to the waste hauler's costs. *See Dean Milk Co.*, 340 U.S. at 355, 71 S.Ct. at 298 (in analyzing nondiscriminatory, available alternatives, the Court noted that the city could inspect imported milk and charge the actual and reasonable cost of such inspection to the importing producers and processors); *Al Turi Landfill, Inc.*, 556 F.Supp. at 238–39 (noting that the nondiscriminatory operating fee must bear a relation to the town's cost of inspection). Thus, if the state chose to inspect the trash

to ensure compliance with state and federal law, the state could pass this cost on to the haulers through the tipping fee. Some justifications, apart from the origin of the trash, might exist for charging different tipping fees. For example, if it cost the state more to inspect baled trash as opposed to compacted trash, then the state might be able to pass this cost on to those haulers with baled trash—even if baled trash is primarily from out-of-state.

While this court expresses no opinion on the ultimate constitutionality of any of these suggested alternatives to the challenged tipping fee provision,[38] there are clearly nondiscriminatory alternative means by which the state could prolong the life of Indiana's landfill and reduce the amount of hazardous and infectious medical waste illegally dumped in sanitary landfills.

The Governor, however, argues that such nondiscriminatory alternatives are not reasonable because they are not as efficient in achieving the state's legitimate local purpose. *See Hughes*, 441 U.S. at 336, 99 S.Ct. at 1736 (stating the third prong of the test as "whether alternative means could promote this local purpose *as well* without discriminating against interstate commerce") (emphasis added). Instead, the Governor argues that there are valid reasons for treating out-of-state waste differently than in-state waste, apart from its origin. *City of Philadelphia*, 437 U.S. at 626–27, 98 S.Ct. at 2537 ("[W]hatever New Jersey's ultimate purpose, it may not be accomplished by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently."). For example, he suggests that Indiana landfill operators are more familiar with Indiana generators, Indiana haulers

---

**38.** The court does not intend to suggest that the less discriminatory alternatives discussed are the only ones available to the state. The alternatives discussed are used by way of example rather than by way of limitation. Creative legislators have a great capacity for devising alternative solutions to regulatory problems; a court is limited to the facts before it. Many of the Supreme Court's commerce clause opinions have contained specific descriptions of alternative regulations that the Court deemed to be nondiscriminatory. *See, e.g., Hunt*, 432 U.S. at 354, 97 S.Ct. at 2447; *Dean Milk Co.*, 340 U.S. at 354–355, 71 S.Ct. at 298. However, unless enacted into law, no alternative can be tested against constitutional standards. That would be a case for another day, and this court expresses no opinion on it.

and Indiana trash and that as a result, this familiarity renders Indiana trash somehow less dangerous than out-of-state trash. He further asserts that solid waste generators and haulers in Indiana are less likely to violate federal and state laws regarding solid waste disposal, and that trash coming from Indiana is, therefore, inherently safer than out-of-state waste.

These assertions were not supported by any factual basis. There was evidence that on at least a few occasions in May and June of 1990, out-of-state haulers did deliver loads of waste that may not have been in compliance with the Indiana infectious waste law. Commissioner Prosser expressed concern about the level of compliance with the federal medical waste tracking system. Her view of human nature leads her to believe that disposers of medical waste are likely to try to avoid stringent and costly requirements. While she may be correct, the evidence does not substantiate her view. In fact, there was no comparative evidence to show that depositors of trash originating in Indiana are any more likely to be in compliance with the Indiana hazardous material and infectious waste restrictions than are depositors of out-of-state trash. Without the factual predicate to support this conclusion, this court can only reject this parochial argument for discriminating against out-of-state trash.

To elaborate on the claim that Indiana trash is safer than out-of-state trash, the Governor points to the comprehensive regulations in place in this state. The centerpiece of this argument is Indiana's infectious waste statute, Ind.Code § 16–1–9.7–1 to 16–1–9.7–8.[39] Indiana's infectious waste statute requires persons and facilities that handle infectious waste in Indiana to treat it in accordance with state regulations before disposing of it and authorizes the Indiana State Board of Health to make inspections to ensure compliance. The statute does not provide a mechanism for tracking the infectious waste from the generator to the disposal site. The Governor argues that as a result of this statute, Indiana trash is less likely to contain infectious waste than out-of-state trash.

The disposal of some medical waste is subject to federal regulation under a "demonstration program," which only applies to a limited number of states. 42 U.S.C. § 6992a–6992k. This federal program provides, in part, for the tracking of medical waste from its point of origin to disposal and for the segregation and placement of such waste in labeled, safe containers. 42 U.S.C. § 6992b. Indiana was one of the states covered under the federal program, but Prosser stated that Indiana chose to opt out of the federal program because Indiana had a statute in place that she thought was at least as effective. The two statutes are not identical, since Indiana's emphasizes treatment of infectious waste, and the federal statute emphasizes tracking of medical waste. Commissioner Prosser expressed her opinion that the federal act was difficult to enforce.

---

**39.** Indiana also points to the federal regulations that control the disposal of hazardous waste in support of its claim that Indiana solid waste is less dangerous than out-of-state waste. The disposal of hazardous waste is subject to RCRA, 42 U.S.C. §§ 6901–6992k. While small quantity generators are exempt, all other hazardous waste disposal is governed by RCRA, which provides "cradle-to-grave" regulation by setting minimum standards for the generation, treatment, storage, and disposal of hazardous wastes in the nation. Furthermore, Prosser testified that there are thirty-seven hazardous waste sites in Indiana that have been nominated by IDEM for clean-up under CERCLA, 42 U.S.C. §§ 9601–9675. Two of those sites are sanitary landfills, which accepted waste from in- and out-of-state: Tippecanoe and Northside landfills. The state, however, did not present any evidence to show whether in-state or out-of-state generators were responsible for the illegal depositing of this hazardous waste. There was no direct evidence tying any particular party or group to alleged illegal dumping of hazardous waste in Indiana, nor was there any evidence regarding the compliance rate with the federal hazardous waste regulations by in-state versus out-of-state generators from which to infer that out-of-state generators are more likely to violate the federal law. Because the federal regulations apply equally to any hazardous waste generated in the country, without regard to its state of origin, these regulations cannot render Indiana's trash more safe than the trash from other states. The state has simply failed to show that out-of-state waste contains more illegal hazardous waste than in-state waste.

She was skeptical that generators of medical waste would comply with the federal act, and the state presented evidence to support her skepticism. State IDEM inspectors discovered infectious medical waste deposited in Indiana landfills from out-of-state.[40] While this evidence may establish that the federal act is less than 100% effective in preventing the illegal dumping of infectious waste, it does not address the effectiveness of Indiana's statute. Thus, this court cannot draw the inference that the state wants it to draw—i.e., that Indiana trash is inherently safer than out-of-state trash. Moreover, this court doubts that a state can, under the commerce clause, justify discrimination against interstate commerce on the sole grounds that the regulatory scheme developed by that state appears to be more stringent than other states' regulations.[41] The *City of Philadelphia* Court spoke in terms that suggest that there must be an *inherent* difference between in-state and out-of-state trash to justify a discriminatory state regulation. Regulatory differences are not enough to justify the discriminatory treatment of out-of-state waste,

without sufficient evidence that the effect of the regulation actually results in "cleaner" in-state waste.

The defendant failed to prove that there is any inherent difference between Indiana waste and other states' wastes on which to base discriminatory treatment. Thus, this court concludes that the tipping fee provision is discriminatory in practical effect, and while the tipping fee serves to a substantial extent a legitimate local purpose, reasonable nondiscriminatory alternatives are available. As a result, this court strikes down as violative of the commerce clause, Ind.Code § 13–9.5–5–1(a)(2)(A), which the specific provision that imposes on out-of-state trash a different formula for computing the amount of the tipping fee owed.

### 2. Health Officer Certification

The health officer certification statute [42] establishes, as a precondition to the disposal of a load of solid waste generated outside of Indiana, that the hauler present to the landfill operator a document in which a health or environmental officer in the state that generated the largest part of the solid

**40.** This court took under advisement the plaintiffs' objections to the admissibility of the defendant's evidence of medical waste found at Indiana sanitary landfills. Specifically, the plaintiffs objected to the evidence on the grounds of failure to lay an adequate foundation, insufficient chain of custody and irrelevancy. This court now overrules the plaintiffs' objections and admits the evidence of medical waste. While it is clear that the defendant did not present a complete chain of custody, the cases establish that any breaks in the chain of custody impact the weight of the evidence and not its admissibility, as long as the court makes a threshold determination that such evidence has not been changed in any important respect. *See Hoover v. Thompson,* 787 F.2d 449, 450–51 (8th Cir.1986); *Ballou v. Henri Studios, Inc.,* 656 F.2d 1147, 1154–55 (5th Cir.1981); *cf.* Note, *Admission of Demonstrative Evidence,* 61 Nw.U. L.Rev. 472, 477–79 (1966) (discussing the relaxed chain of custody requirement in state court civil cases). A trial court also is entitled to assume that public officials who had custody of evidence did not tamper with the evidence. *Williams v. Butler,* 746 F.2d 431, 442 (8th Cir. 1984). In this case, this court finds no hint that the defendant and his agents did anything to compromise the authenticity of the proffered evidence.

**41.** Furthermore, Indiana's tipping fee statute is only one part of a larger regulatory scheme. That scheme also includes the requirement that out-of-state trash be certified by a foreign state's health official as being free of hazardous and infectious medical waste. It is illogical for the Governor to argue that even after this certification is made, the out-of-state trash is still more dangerous than Indiana trash (which the statute does not require to be certified).

**42.** The health officer certification provision reads in pertinent part as follows:

(c) Upon transporting solid waste in a vehicle to a final disposal facility (as defined in IC 13–9.5–1–14) in Indiana for disposal, the operator of the vehicle shall present to the owner or operator of the facility:

. . . .

(2) If the largest part of the solid waste was generated in a state other than Indiana, a document in which an officer of a state or local government who has responsibility in that other state for the protection of public health or the environment certifies that the part of the solid waste generated in that state is not subject to regulation as hazardous waste under the federal Solid Waste Disposal Act (42 U.S.C. 6901 et seq.) or as infectious waste under IC 16–2–9.7.

Ind.Code § 13–7–22–2.7(c).

waste certifies that the part of the waste that came from that state is not subject to regulation as hazardous waste under federal law or infectious waste under Indiana law. Because this regulation facially discriminates against out-of-state waste, the elevated scrutiny test will be applied to determine its constitutionality.

■ The Governor has asserted that the health officer certification is supported by the state's legitimate interest in preserving the health and safety of its citizens. As before, this court accepts this as a valid expression of a legitimate state interest.

Next, the Governor asserts that the health officer certification serves this interest to a substantial extent. The evidence admitted at trial leads this court to conclude that the Governor's assertion is correct—the practical effects of the health officer certification do substantially advance the state's interest in health and safety. The evidence at trial established that the prevalent use of transfer and recycling stations in the interstate shipment of solid waste from the East Coast makes it very difficult if not impossible to determine which state "generated" the solid waste. As a result, the hauler of interstate solid waste has no way of knowing which state's officer can certify his or her load. Even if the hauler can identify the state that generated the largest part of the trash, the statute provides little guidance as to which health or environmental officer within that state is permitted to make the certification under Indiana law. As previously noted, the evidence did not disclose how a trash hauler could find an officer willing to issue such a certification and the law does not require that the certifying officer have any expertise in the subjects of hazardous or infectious waste. Commissioner Prosser testified that her department was in the process of collecting a list of foreign state officials who could make acceptable certifications under Indiana law. However, Prosser admitted that the list was incomplete at the time of trial. Even if this list were completed and made available to the public, it would not have eased the burden of complying with the statute. The purpose of the list was not to reflect the names of foreign state officials who had agreed to make certifications; rather, it appeared to have been intended to simply notify various officials in other jurisdictions about the requirements of certification to comply with Ind.Code § 13–7–22–2.7(c)(2). There was no indication that these officials had given IDEM permission to place their names on the list or that they were willing to issue the required certifications. Thus, the hauler was still left with the task of convincing an official on the list, or some other qualified person, to make the certification. This task proved quite formidable for the plaintiffs in this case. The evidence shows that Castenova attempted to get certifications, but was rebuked on grounds that making the certification was not within that official's job description or that the official lacked knowledge of the standards to apply. Government Suppliers met with similar difficulties, particularly in the major urban areas, but was able to obtain some certifications in New Jersey. However, Commissioner Prosser examined those certifications during the trial and found them to be inadequate under the Act. All of this evidence leads this court to the conclusion that the health officer certification constitutes a practical ban on the importation of solid waste into Indiana.

This is not to say that a total ban on the importation of solid waste could not serve, to a substantial extent, the state's interest in promoting the health and safety of Indiana's citizens. In reality, a total ban of this sort does serve this interest in at least two ways. First, scarce Indiana landfill space is conserved, thereby extending its life and delaying the day when Indiana must transport its own waste to more distant and expensive sites. Second, the diversion of a load of solid waste away from an Indiana landfill also diverts from the state the problems that would result to the environment if that load were to contain hazardous or infectious waste. *See City of Philadelphia*, 437 U.S. at 626, 98 S.Ct. at 2537 ("New Jersey has every right to protect its residents' pocketbooks as well as their environment"). Even if the law's practical impact is something less than a

total ban on the importation of solid waste, the law will at least cause a general reduction in the amount of solid waste entering the state and a similar reduction in the amount of hazardous and infectious medical waste illegally entering the state. Both of these alternative results substantially furthers the state's asserted interest in promoting the health and safety of Hoosiers. Thus, the Governor has met his burden on the second element of the elevated scrutiny test.

 But even if this portion of the Act does serve a legitimate state interest, in order to vindicate the constitutionality of this statute, the Governor must prove that nondiscriminatory, alternative means of achieving the state's interests are not available. The Governor has failed to do this, for the state easily could have written a nondiscriminatory statute. Perhaps the most obvious alternative is to require all haulers of solid waste being disposed of in an Indiana landfill to present to the landfill a certificate from a health officer. This alternative would have the advantage of textual evenhandedness. Inspecting all solid waste being buried in Hoosier soil— regardless of its source—would necessarily

be more protective of the environment than inspecting only part of the trash buried here. Moreover, universal inspections will raise the cost of disposing of all trash, thereby increasing the financial incentive on all generators of solid waste to recycle their trash. Recycling trash will, in turn, extend the lives of Indiana's landfills.[43]

Since there exists a nondiscriminatory alternative regulation that serves the state's legitimate interests as effectively as the health officer certification statute, this challenged provision does not pass the commerce clause's elevated scrutiny test.[44] The health officer certification statute is in violation of the dormant commerce clause.

### 3. Hauler Certification

The final provision of the new Indiana law that has been challenged by these plaintiffs requires all haulers seeking to dump solid waste in an Indiana landfill to present to the landfill "a written statement" in which the hauler certifies, under penalty of perjury, the county in Indiana or, if outside Indiana, the state "in which the largest part of the solid waste was generated."[45] The plaintiffs have alleged that this hauler certification provision burdens interstate commerce in violation of

**43.** Again, there may be many other less discriminatory options available to satisfy this interest of the state and the court has not attempted to cover the entire field of possible alternatives, nor does it address the appropriateness or constitutionality of any alternative. *Supra* note 38, at 770.

**44.** This court previously indicated that the motives behind the enactment of this law were not relevant to the commerce clause analysis. *Supra* at 767–769. Nonetheless, of the three provisions challenged here, the motives behind this one are the most suspect for a variety of reasons. This provision was added to the pending legislation without consideration of whether the required certification could actually be obtained. The initiative behind this provision appears to have been generated by the Governor's staff. Not even a pretense of evenhandedness can be found in the imposition of the certification requirement only on out-of-state waste. The Act does not relate the qualifications of the certifying officer to the subject matters of the certification. A truthful certification would require a personal and visual inspection of all trash in each load. Health and environmental officers in states other than Indiana have no legal duty to inspect trash being transported to this state. Even if a certificate could be ob-

tained to comply with this portion of the Act, there is no requirement that it be sent to IDEM or retained by the landfill operator or the hauler. Most importantly, some public statements made by government officials in connection with the enactment of this requirement could be read to imply that the health officer certification was interjected into this Act to effectively ban the importation of out-of-state waste.

However, given that the traditional elevated scrutiny commerce clause analysis results in the striking down of this portion of the Act, there is no need to undertake the uncertain inquiry into the true motives behind this provision. Besides, such an inquiry is inherently incompatible with the preservation of the executive privilege asserted by the Governor and his staff. *See Government Suppliers Consolidating Servs., Inc. v. Bayh,* 133 F.R.D. 531 (S.D.Ind.1990) (Entry Denying Plaintiffs' Motion to Reconsider Magistrate's Entry).

**45.** Ind.Code § 13–7–22–2.7(c) in pertinent part reads as follows:

(c) Upon transporting solid waste in a vehicle to a final disposal facility (as defined in IC 13–9.5–1–14) in Indiana for disposal, the operator of the vehicle shall present to the owner or operator of the facility:

the commerce clause, and is overly vague, making it unconstitutional under the due process clause of the fourteenth amendment of the United States Constitution.

Unlike the tipping fee and the health officer certification provisions, the hauler certification provision is a textually even-handed regulation that does not make an invidious distinction between in-state and out-of-state solid waste. Although even-handed in its text, the provision is not immune from constitutional scrutiny. It is, however, held to a less strict standard.[46] The test applied is the one articulated by the Supreme Court in *Pike:*

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike,* 397 U.S. at 142, 90 S.Ct. at 847.

A state law is more likely to survive the *Pike* test, in part, because the burden of

proving the unconstitutionality of the law rests at all times on those challenging it. *Cf. Hughes,* 441 U.S. at 336, 99 S.Ct. at 1736 (burden shifts to the state only after the plaintiff has demonstrated that the law discriminates on its face or in practical effect against interstate commerce).

With these points in mind, this court must now determine whether the hauler certification "regulates evenhandedly to effectuate a legitimate local public interest." The Governor argues that the statute was enacted out of a concern for the health and safety of Indiana citizens. Congress and the courts have always recognized that the promotion of health and safety is a core function of local government.[47] When Indiana regulates evenhandedly in pursuit of this important state interest, this court is reluctant to strike down the regulation under the dormant commerce clause. *Kassel,* 450 U.S. at 670, 101 S.Ct. at 1316 ("a State's power to regulate commerce is never greater than in matters traditionally of local concern"). As with the two other provisions challenged in this suit, the court gives substantial credence to the Governor's stated interest in preserving the health and safety of Indiana citizens.

In response to the Governor's asserted interest, the plaintiffs re-argue their claim that this interest is a post-hoc rationaliza-

---

(1) A written statement in which the vehicle operator certifies, under oath or affirmation and subject to the penalty for perjury under IC 35-44-2-1, the:

 (A) County in Indiana; or

 (B) State, if a state other than Indiana; in which the largest part of the solid waste was generated....

Ind.Code § 13-7-22-2.7(d) reads as follows:

 (d) If the operator of a vehicle does not present a written statement to the owner or operator of a final disposal facility as required by subsection (c)(1), the owner or operator may not permit the disposal in the final disposal facility of the solid waste transported in the operator's vehicle.

**46.** Courts have recognized that where regulations do not discriminate on their face against interstate commerce, their burden usually falls on local economic interests as well as other states' economic interests, thus ensuring that a state's own political processes will serve as a check against unduly burdensome regulations.

*See Kassel,* 450 U.S. at 675, 101 S.Ct. at 1318-19; *Raymond Motor Transp., Inc. v. Rice,* 434 U.S. 429, 444 n. 18, 98 S.Ct. 787, 795 n. 18, 54 L.Ed.2d 664 (1978). Where the evidence demonstrates that the burden will not fall evenly on in-state economic interests or where the statute makes exceptions for in-state interests, the statute is more suspect and will be subjected to the elevated scrutiny test.

**47.** Congress recognized the state's role at 42 U.S.C. § 6901(a)(4) ("collection and disposal of solid wastes should continue to be primarily the function of State, regional, and local agencies"). Courts have also recognized the state's role. *See, e.g., Dean Milk Co.,* 340 U.S. at 353, 71 S.Ct. at 297 (regulation of milk products falls within the appropriate local interest of safety, health, and well-being of local communities); *H.P. Hood & Sons,* 336 U.S. at 531-32, 69 S.Ct. at 661-62; *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 471, 101 S.Ct. at 727-28 (environmental protection is an area of legitimate local concern).

tion for the law. This court has already concluded that an otherwise valid law cannot be struck down through a commerce clause challenge simply because it was motivated by an invalid purpose. *See supra* at 767–769. The court does not find such a prohibited purpose present with respect to this provision, and no further elaboration on this point is necessary.

The conclusion that health and safety was the legitimate local public interest behind the statute, however, does not exempt the statute from further scrutiny. Under *Pike*, the statute must actually "effectuate" this interest and can impose no more than incidental burdens on interstate commerce. The Court has often referred to this part of the *Pike* test as a balancing of the state's interest against the burden imposed on commerce. In balancing these two concerns, the court may consider not only the importance of the state's interest, but also the extent to which the challenged regulation furthers the interest, the extent of the burden on interstate commerce, and whether there are alternative ways to achieve the state's interest without imposing so great a burden on commerce. *See Pike*, 397 U.S. at 142, 90 S.Ct. at 847. The Supreme Court noted in *Kassel* that some state regulations may not survive this balancing test: "Regulations designed for that salutary purpose [health and safety] nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause." *Kassel*, 450 U.S. at 670, 101 S.Ct. at 1316. In the paragraphs that follow, this court examines and balances the interests implicated by the hauler certification.

This court has already noted that concerns over the health and safety of Hoosier citizens lie at the core of Indiana's legitimate interests. The extent to which this important interest is furthered by the hauler certification, however, is quite small. The Governor has asserted that the hauler certification advances the health and safety of Indiana's citizens by providing IDEM with information about the geographical source of solid waste being dumped in the state. This information, he argues, may prove valuable in the development of future statutory or administrative regulations. The Governor also presented testimonial opinion evidence to show that this information might be useful in pursuing those responsible for dumping imported hazardous or infectious waste.[48] The Governor's evidence on both of these issues would be more persuasive if he could show that the information would ever actually get to IDEM. After all, the statute does not require the landfill to file the hauler certification with IDEM or any other state agency, nor does it require the landfill to retain the certification. Indeed, the statute does not even require the landfill to take possession of the certification. The statute requires only that the hauler *"present* [a hauler certificate] to the owner or operator of the [final disposal] facility." Ind.Code § 13–7–22–2.7(c) (emphasis added). Of course, IDEM may be able to correct this oversight in the statute by enacting an administrative regulation requiring the certification to be filed with the state or to be held by the landfill operator for inspection by IDEM.[49] Until this is done, however, the state will obtain little or no information from the hauler certification.[50] Even if

48. If the tipping fee and health officer certification provisions had survived constitutional scrutiny, then the Governor could have used this connection to bolster the value of the hauler certification to the overall regulatory scheme. However, neither of these provisions has survived this court's scrutiny. Nonetheless, the mere fact that the hauler certification would have aided in the enforcement of these unconstitutional provisions does not render the hauler certification itself unconstitutional. Guilt by association is invalid with respect to both criminal defendants and state statutes.

49. The evidence at trial did not indicate that IDEM has any plans to require transmittal of the certification to the agency. Commissioner Prosser did acknowledge that retention of the certifications, whether by the agency or the landfill operators, was important for collection of useful information.

50. The fact that the state has opted for a statutory provision that leads to the collection of only a limited amount of information does not automatically condemn the statute. The law is clear that a state need not chop down a problem with one swing of its legislative axe. Rather, a

IDEM does act to require the certificates to be filed, the only information IDEM would obtain would be a list of those states that import solid waste into Indiana landfills. Since each certificate would represent one semi-trailer full of solid waste, IDEM would be able to estimate the amount of trash each state dumped into Indiana's landfills by totalling the certificates from each state. However, since the statute requires the hauler to identify only the state that generated the "largest part" of the shipment, the estimate would be crude at best. For example, a hauler carrying trash from ten states would need to identify only the state that contributed the most to the load—even if that state's share constituted only a plurality of the total trash in the load. Although Indiana has not suggested how this information could help the state develop future legislation, there could be some slight value to the information. Presumably, if Indiana learns that most imported trash is being generated by one state, it could more effectively focus its regulatory powers to ensure that this trash complies with Indiana or federal law. For example, Indiana might seek to form an interstate compact with the exporting state to control the flow of trash.[51] Or Indiana might seek to place its own inspectors in the exporting state to inspect solid waste shipments at the point of loading. The hauler certification will be of no value, however, in the state's effort to pursue those responsible for dumping dangerous trash in Indiana. Even if every piece of trash in an Indiana landfill were identified by its state of generation (which the hauler

certification does not do), it is doubtful that Indiana could use this information to identify the party responsible for dumping the trash. Thus, although the hauler certification does advance the state's interests in health and safety, it does so only indirectly and to a very limited extent.

In contrast, the statute poses a significant barrier to interstate commerce. Before being allowed to dump out-of-state waste in an Indiana landfill, the hauler must identify the state in which the "largest part of the solid waste was generated." Ind.Code § 13–7–22–2.7(c)(1)(B). The burden this poses to the interstate shipment of solid waste can be understood only against the backdrop of the realities of interstate trash shipments. The evidence at trial showed that almost all trash coming into Indiana originates on the East Coast and passes through a recycling or transfer station prior to being loaded onto a semi-trailer for shipment to the Midwest. Transfer stations are located throughout the East Coast and receive and commingle trash from many states. As a result, haulers who transport trash from an East Coast transfer station to Indiana can trace the trash back only to the transfer station. Even the operator of a transfer station cannot know where the trash being dumped there originated. Many curbside collectors of trash deposit their loads at a transfer station. They are not bound by state lines in their collection routes. Besides, a curbside collector of trash can only know where it was picked up and cannot know where the refuse originated. So, even if the operator of the transfer station

---

state "'may implement [its] programs step by step, ... adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.'" *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 466, 101 S.Ct. at 725 (quoting *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976)). However, this rule of law does not mean that regulations intended to solve only a small part of a larger problem can impose significant burdens on interstate commerce with impunity. The Court requires the interests furthered by the state law to be weighed against the burdens imposed on commerce. Where the state interest is only marginally advanced, the burden on interstate commerce must likewise be small if the statute is to survive.

**51.** Under article I, section 10 of the United States Constitution, states may enter into interstate compacts only with the consent of Congress. Such congressional approval can validate state action that would otherwise violate the dormant commerce clause. *See generally,* L. Tribe, *American Constitutional Law* § 6–33, at 521 (2d ed.1988); 1 R. Rotunda, J. Nowak, & J. Young, *Treatise on Constitutional Law: Substance and Procedure* § 12.5 (1986); *cf. Hardage v. Atkins,* 582 F.2d 1264, 1266 (10th Cir.1978) (striking down a mandatory reciprocity clause in an Oklahoma statute that prevented the shipping of controlled industrial waste into Oklahoma from any state that did not enter into a reciprocity agreement with Oklahoma).

asks each of the collectors dumping trash at his station to identify the trash deposited, he could only learn the locations from which it was collected. Then, if the transfer station operator was able to sort and keep separate the trash arriving there from different states, he could only pass along to the long distance hauler the information he learned from the collectors. Obviously, this information would be merely an identification of the points of collection of the trash, and would not necessarily be the points of origination. The law, however, requires the hauler to identify the state in which the trash was "generated"—which this court interprets to mean point of origination.[52] The statute thus requires haulers of out-of-state trash to provide information to the landfill that has been lost through the realities of the solid waste shipping business.[53]

The impossibility of complying with the statute is exacerbated by the fact that the hauler is required to make the certification under penalty of Indiana's perjury law, Ind.Code § 35-44-2-1. Under this perjury statute, a hauler risks being convicted not only if he or she makes a knowingly false certification, but also if he or she makes a certification not believing it to be true.[54] Thus, a hauler who makes a certification without an adequate basis for knowledge as to the state of generation may be exposed to a charge of perjury. The burden on interstate commerce posed by this statute is quite significant. The statute requires the hauler to present to the landfill information that cannot be obtained if the trash comes from outside of Indiana. Moreover, the hauler risks a criminal prosecution if he or she makes a false certification.[55] As a result, haulers are encouraged to carry their loads to other states.

In the end, when all of these factors are weighed in the balance, the hauler certification, despite its evenhandedness, cannot

---

**52.** This court suggested in a prior entry in this case that there could be some dispute over the meaning of the word "generated." *See Government Suppliers Consolidating Servs., Inc.,* 734 F.Supp. at 868 (preliminary injunction entry). However, the evidence presented at trial does not support a finding of vagueness. On the contrary, all the evidence indicates that the General Assembly intended the hauler to certify the state in which the trash originated. The word "generated" was used in other parts of the statute in a manner consistent with this meaning. *See* Ind.Code § 13-7-22-2.7(b) (exempting from regulation the disposal of solid waste on land owned by the "generator" of the solid waste). Prosser and State Senator Vobach both testified that they interpreted the word "generated" to mean point of origination. The court concludes that this evidence is consistent with the plain meaning of the word as it is used in the hauler certification statute itself.

Because the statute's meaning is clear, *Pullman* abstention is inappropriate, *see Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) (holding that a federal court should defer decision while a federal plaintiff seeks a state determination of an unclear state law issue that may render unnecessary a decision on a constitutional claim), as is the application of the rule of statutory construction which states that, where a statute can have more than one meaning, it ought to be interpreted in a fashion that saves it from unconstitutionality, *see The Railway Reorganization Act Cases,* 419 U.S. 102, 134, 95 S.Ct. 335, 354, 42 L.Ed.2d 320 (1974).

**53.** The plaintiffs have not challenged Ind.Code § 13-9.5-11-1. Under this provision, a solid waste hauler must certify the county *and* state of *origin* of the largest part of the solid waste by volume. This statute, unlike Ind.Code § 13-7-22-2.7, permits a hauler to rely on averages in making the certification. *See* Ind.Code § 13-9.5-11-3.

**54.** *Cf. Indianapolis Traction & Terminal Co. v. Henby,* 178 Ind. 239, 254-55, 97 N.E. 313 (1912) (one can be guilty of perjury if one swore to a fact without being in possession of information about that fact); *but see Gardner v. Indiana,* 229 Ind. 368, 97 N.E.2d 921 (1951) (perjury cannot result from mere negligence or carelessness resulting from failure to ascertain the truth of sworn facts). Both of these cases were decided under previous perjury statutes, which could be fairly characterized as narrower in scope than the present Indiana perjury statute.

**55.** One can imagine unusual scenarios arising from enforcement of the hauler certification. In theory, a hauler could be a repeat violator of this statute by swearing to the state of origin of the "largest part" of three separate loads of trash without fully believing his statements to be true. After this third offense, he could receive a maximum sentence of eleven years imprisonment. Ind.Code § 35-50-2-7.1. Upon arriving at his prison cell, this hypothetical hauler/inmate (not unlike Arlo Guthrie as he was seated on the "Group W" bench) is asked by his cellmate, "What were you arrested *for,* Kid?" A. Guthrie, "Alice's Restaurant," (Copyright 1966, 1967 by Appleseed Music, Inc.) (Guthrie's ballad about the unusual chain of events which followed his transgression of trash dumping laws in Massachusetts).

survive scrutiny under the *Pike* balancing test. While it furthers a legitimate state interest, it does so only to a small degree.[56] The burden imposed on the interstate shipment of solid waste is clearly excessive in relation to the putative local benefits.[57] Thus, this court must conclude that the hauler certification violates the commerce clause and must strike it down as unconstitutional. This conclusion is consistent with other court decisions based on the *Pike* balancing test.[58]

### C. Fourteenth Amendment Void for Vagueness Claim

Because all three of the challenged provisions have failed to survive the plaintiffs'

commerce clause challenge, this court does not need to address the plaintiffs' claim that the use of the words "largest part," "public health or environment officer," and "generated" renders the statutes void for vagueness under the fourteenth amendment of the United States Constitution.

### IV. Conclusion

Today Indiana joins the list of states whose statutes have not fully survived constitutional scrutiny. This case may thus be closed, although the weighty concerns it represents persist.

The attempt to regulate the out-of-state waste coming into Indiana through these

---

**56.** While the *Pike* test does not look to see if less burdensome alternatives are available, it is interesting to note that the evidence at trial showed that there is at least one alternative means by which the state could acquire equally useful information without imposing as significant a burden on interstate commerce. Trial testimony revealed that all haulers carry with them a copy of the bill of lading. This document is a receipt given by the shipper to the transfer station to acknowledge the delivery of the goods to the final destination. The bill of lading contains the date the shipment was picked up at the transfer station, the name of the hauler's company, the name and location of the transfer station, and possibly the name and location of the company that brokered the shipment. Indiana could require the landfill operator to obtain a copy of the bill of lading from the hauler and to file it with IDEM. Because every hauler carries a copy of the bill of lading in the cab of the semi-trailer, requiring it to be produced for copying by the landfill operator would impose at most an insignificant time delay. Not only would this requirement impose little burden on the hauler, it also would provide IDEM with information that would be far more useful than the mere identity of the state that generated the trash. Because the hauler would not be required to complete any information himself, but only provide the landfill operator with access to the pre-existing bill of lading, this alternative would not need to use the threat of perjury as a club to induce truthful compliance.

**57.** In applying the *Pike* test to the hauler certification, this court has been generous to the Governor's case. Although textually evenhanded, the practical application of the regulation poses a far greater burden on interstate commerce than on intrastate commerce as a result of the fact that transfer stations are commonly used to facilitate interstate trash shipments and rarely used for intrastate trash. Since the stricter

commerce clause test can be applied to a statute that is either *facially* discriminatory or discriminatory in its *practical effect, see Hughes,* 441 U.S. at 336, 99 S.Ct. at 1736, this court would have been well within the law if it had applied the stricter test to the hauler certification on grounds that the regulation discriminates against interstate commerce in practical effect. Instead, this court has applied the *Pike* test. The outcome is no different, the statute fails both tests. *Cf. Hunt,* 432 U.S. at 340 n. 5 & 352, 97 S.Ct. at 2440 n. 5 & 2446 (district court found state regulation unconstitutional under both *Pike* test and stricter elevated scrutiny test).

**58.** *See, e.g., Kassel,* 450 U.S. at 678–79, 101 S.Ct. at 1320 (Iowa regulation banning long trucks from highways imposed substantial burden on interstate commerce without a corresponding increase in the safety of highway travel); *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. at 472–73, 101 S.Ct. at 728–29 (burden imposed on milk bottlers as a result of state's law banning the sale of milk packed in plastic containers is slight when compared with the significant state interest in promoting conservation of energy and easing solid waste disposal problems); *Hunt,* 432 U.S. at 348–54, 97 S.Ct. at 2444–47 (North Carolina statute requiring closed containers of apples to be labelled with USDA grades or no grades at all imposed a substantial burden on the sale of apples from the state of Washington, since Washington utilized its own labelling scheme that was superior to the USDA's scheme and since the North Carolina statute failed to advance its asserted state's interest in eliminating consumer confusion); *Pike,* 397 U.S. at 145, 90 S.Ct. at 849 (burden imposed on cantaloupe grower requiring it to build a packing plant in the state of Arizona is clearly excessive in relation to the state's "tenuous" interest in ensuring that Arizona-grown cantaloupe is identified as having been grown in Arizona).

780

three regulations fails to clear the constitutional hurdles posed by the commerce clause. By no means, however, does this prevent Indiana from regulating the trash that is brought here. Indiana has full authority to regulate out-of-state refuse in all ways that it regulates in-state refuse, including imposing and enforcing stringent regulations on infectious or hazardous waste. Similarly, this opinion does not restrict future legislative or regulatory efforts to address the problems caused by the influx of out-of-state waste, assuming that the evenhandedness required by the commerce clause is present.

However noble and popular these three provisions of H.E.A. 1240 appear to be, they must give way to the constitutional principles discussed above. The same protection that the commerce clause gives to the citizens of other states who feel the need to import waste into Indiana protects Indiana citizens when they export hazardous waste to other states.[59] Those provisions will protect future generations of Hoosiers should they find the need to export even solid municipal waste to another state. Commerce, even in such "bads" as waste, is a two-way street.

It should be noted that this decision has no effect on the other provisions of H.E.A. 1240. It only strikes down the three narrow provisions addressed here. No other aspects of that law were challenged in this suit. For example, Indiana can enforce the solid waste management requirements of the Act. More directly related to this case, Indiana can initiate the collection of the $0.50 per ton tipping fee required by Ind. Code § 13–9.5–5–1(a)(1) and (a)(2)(B) on each load of waste deposited in Indiana landfills.[60] It can also require the haulers of waste originating within Indiana to certify the county of origin of such waste. The only provisions of the Act that have been stricken are the three provisions that were challenged in this lawsuit. A judgment

effectuating this ruling will be issued contemporaneously with this entry.

### DECLARATORY JUDGMENT

Based on the evidence submitted at trial and the legal arguments of the parties:

IT IS DECREED, ORDERED, ADJUDGED, AND DECLARED that the following statutory provisions violate the commerce clause of the United States Constitution: Ind.Code § 13–7–22–2.7(c), (d) & (e) and Ind.Code § 13–9.5–5–1(a)(2)(A).

Therefore, IT IS FURTHER ORDERED that the defendant, the Honorable Evan Bayh, Governor of the State of Indiana, is hereby PERMANENTLY ENJOINED from enforcing these statutory provisions.

---

**59.** Though not relevant to this decision, plaintiffs introduced some evidence to show that Indiana is the fifth largest exporter of hazardous waste in the nation.

**60.** Plaintiffs do not contest paying the same tipping fee as haulers of in-state trash. Their commerce clause claim focuses only on the discriminatory tipping fee in Ind.Code § 13–9.5–5–1(a)(2)(A).